648 F.Supp. 537 (1986)
Moses LEROY, et al., Plaintiffs,
v.
CITY OF HOUSTON, et al., Defendants.
GREATER HOUSTON CIVIL COUNCIL, INC., Plaintiff,
v.
Frank MANN, Defendant.
Moses LEROY, Plaintiff,
v.
CITY OF HOUSTON, Defendant.
Civ. A. Nos. H-78-2174, H-73-1650 and H-75-1731.
United States District Court, S.D. Texas, Houston Division.
August 1, 1986.
*538 *539 L.A. Greene, Jr., Houston, Tex., George Korbel, Jessie Bottello, Craig Washington, Frumencio Reyes, San Antonio, Tex., David Boddie, Houston, Tex., for plaintiffs.
Denise R. Ferguson, Asst. U.S. Atty., Houston, Tex., for U.S.
Robert M. Collie, Jr., City Atty., John R. Whittington, Jr., John E. Fisher, Sr., Asst. City Atty., Houston, Tex., Paul F. Hancock, Civ. Rights Div., Dept. of Justice, Washington, D.C., for defendants.
Mark A. Posner, Dept. of Justice, Washington, D.C., amicus curiae.

MEMORANDUM OPINION AND ORDER
McDONALD, District Judge.
Pending before the Court are the Motions for Attorneys' Fees of L.A. ("Al") Greene, George Korbel, Jesse Botello, Craig Washington, and Frumencio Reyes. Having considered the arguments of the parties and the applicable law, the Court is of the opinion that the Motions should be GRANTED. The filing and the litigation of the cases for which Plaintiffs seek attorneys' fees and Plaintiffs' attorneys' unceasing efforts before the Department of Justice were essential catalysts to the City of Houston's adoption of a new system of electing its City Council members. The Plaintiffs were prevailing parties and should be awarded fees for services performed. The amount of the award is set forth in the tables made a part of this Opinion.
The first case, styled Greater Houston Civil Council, Inc. v. Mann, C.A. No. H-73-1650, was a constitutional challenge to Houston's system of electing its City Council members in at-large elections. The case was decided adversely to Plaintiffs at trial, and was appealed to the Fifth Circuit. During the pendency of the appeal, Houston adopted a mixed system of election for City Council members, utilizing both at-large and single-member district elections. The case was declared to be moot and was remanded to the district court for a determination on attorneys' fees. The second case, Moses Leroy v. City of Houston, C.A. No. H-75-1731, was a challenge under Section 5 of the Voting Rights Act of 1965, 42 U.S.C.  1973c (1982), after Houston annexed land, did not secure preclearance from the Department of Justice or declaratory judgment from the District Court for the District of Columbia, and attempted to hold an election. The court hearing Leroy refused Plaintiffs' requested injunction and the case was closed after the Justice Department precleared the changes. The third case, Moses Leroy v. City of Houston, C.A. No. 78-2174 [hereinafter referred to as "Leroy II"], also challenged an election scheduled to be held after annexations that had not been precleared or declared not to violate  5 by the District of Columbia court.[1] During the pendency of this litigation Plaintiffs' lawyers met with officials of the Department of Justice who were considering the City's request for preclearance.

I. The legal standards relevant to attorneys' fee awards.
Questions to be considered when making an award of attorneys' fees are: who is the prevailing party; for what services, if any, performed before an administrative agency may the prevailing party be compensated; how are fees computed; and how does the multiplier apply. Plaintiffs' lawyers have requested fees under 42 U.S.C.  1988 and  1973l (e), which respectively provide that:
In any action or proceeding to enforce a provision of Sections 1981, 1982, 1983, 1985 and 1986 of this title, title IX of Public Law 92-318 ... or title VI of the Civil Rights Act of 1964 ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
42 U.S.C.  1988.
In any action or proceeding to enforce the voting guarantees of the fourteenth *540 or fifteenth amendments, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.[2]
42 U.S.C.  1973l (e).
The Supreme Court in Henlsey v. Eckerhart, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983) (footnote omitted), outlined the purposes of the statutes in one of its most recent discussions of  1988:
In Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), this court reaffirmed the "American Rule" that each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary. In response Congress enacted the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C.  1988, authorizing the district courts to award a reasonable attorney's fee to prevailing parties in civil rights litigation. The purpose of  1988 is to ensure "effective access to the judicial process" for persons with civil rights grievances. H.R.Rep. No. 94-1558, p. 1 (1976). Accordingly, a prevailing plaintiff "`should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" S.Rep. No. 94-1011, p. 4 (1976), U.S.Code Cong. & Admin.News 1976, p. 5912 (quoting Newman v. Piggie Park Enterprises, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968).
Unfortunately, awarding fees for civil rights litigation has also spawned, in many instances, "a second major litigation" over those fees. See id. at 437, 103 S.Ct. at 1941; see also Laffey v. Northwest Airlines, Inc., 746 F.2d 4, 29 (D.C.Cir.1984), cert. denied, 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985) (court "aghast" at number of hours devoted solely to fee request); Tasby v. Wright, 550 F.Supp. 262, 285 (N.D.Tex.1982) (main case and fee award litigation constitute "seemingly endless legal struggle"); In re Fine Paper Antitrust Litigation, 98 F.R.D. 48, 68 (E.D.Pa.1983), (task of awarding fees in antitrust suit "not ... an easy one" when judge has to consider voluminous time records, objections thereto, and 41 days of testimony regarding fee petitions) rev'd in part on other grounds, 751 F.2d 562 (3d Cir.1984). The court can attest to the lengthiness and difficulty of awarding fees in the case at bar, the process having taken over three years for the court to reach the point where it could decide the issues. Along the way, inter alia, the court has granted the Defendants four continuances on hearings and has allowed innumerable extensions of time for filings. The Defendants also sought unsuccessfully to recuse the court. See In re City of Houston, 745 F.2d 925 (5th Cir.1984). Plaintiffs' lawyers alone have expended 1737 hours.[3]
In reaching its decision on attorneys' fees, the court must consider and apply four legal standards. The first two standards concern the question of entitlement to fees, i.e., who is a "prevailing party" under the statute and for what administrative work, if any, prevailing parties can be compensated. The second two standards *541 relate to the computation of fees to which a party may be entitled, viz., the viability of the so-called Johnson factors[4] and under what circumstance multipliers are to be used. The court will address each of these legal issues individually, and then proceed to discuss how those factors apply to the cases at bar.
The first standard requiring discussion is the definition of "prevailing party." The statute allows only prevailing parties to receive fees. The parties in the cases at bar[5] offer different formulations of the test for determining who is a prevailing party. Plaintiffs' lawyers contend that the Supreme Court has set out a standard, in Hensley v. Eckerhart, 461 U.S. 424, 429-30, 103 S.Ct. 1933, 1937-38, 76 L.Ed.2d 40 (1983). However, the Supreme Court did not adopt the standard as its own, but merely recognized that the First Circuit had enunciated a standard. The Supreme Court appears not to have adopted any definition of "prevailing party," and the Court must therefore turn to the Fifth Circuit's recent opinion on the subject, Hennigan v. Ouachita Parish School Board, 749 F.2d 1148 (5th Cir.1985).
In Hennigan, the Fifth Circuit reversed a decision by a district court judge that a plaintiff was not a prevailing party. Judge Rubin, writing for the panel, acknowledged that:
The Fifth Circuit opinions have not articulated a consistent standard for measuring whether a plaintiff whose efforts did not result in a judgment in his favor has succeeded sufficiently to be a prevailing party. The district judge may understandably have been misled, for we have phrased the test differently, in a number of opinions.
Id. at 1151 (footnote omitted). The opinion goes on to explain the burden a fee applicant carries:
Despite their variety, all of our prior formulations of the applicable criteria have certain elements in common. All recognize the initial need to identify the goal that the plaintiff sought to achieve in bringing his civil rights action. Although the opinions have not always identified the precise legal or factual condition that the plaintiff sought to change, all have determined the nature of the benefit the plaintiff hoped to gain, or the burden of which he hoped to be relieved, by bringing the lawsuit.
Using this as a benchmark, the first element that must be established by a plaintiff claiming prevailing party status is whether, as a practical matter, the plaintiff's goal was achieved. This is determined in this circuit by applying the central-issue test. In other circuits, as we have discussed, the plaintiff need "succeed [only] on any significant issue in the litigation which achieves some of the benefit [he] sought in bringing suit." When the plaintiff's goal has been achieved by the defendant's unilateral action, the plaintiff must of course also show that the lawsuit caused the defendant to act, and thus allowed the plaintiff to achieve his desired goal. To demonstrate this causal connection, the plaintiff must demonstrate that his suit was a "substantial factor or a significant catalyst in motivating the defendants to end their unconstitutional behavior." This means more, however, than merely showing that the event occurred after suit was filed. Here, as elsewhere in the law, propter hoc must be distinguished from post hoc. The inquiry has been described as "an intensely factual, pragmatic one," and courts should carefully consider the chronology of events in order to assess the provocative effect of the plaintiff's lawsuit.

When the plaintiff has shown both that he succeeded on the central issue in the *542 litigation and that the lawsuit caused the defendant to act, he has made a prima facie case that he is the prevailing party and entitled to attorney's fees.

Id. at 1152 (footnotes omitted) (emphasis added). Defendants contest the propriety of an award by claiming that the applicants did not cause ameliorative action to have been taken. Hennigan addresses this claim:
However, a plaintiff who brings an action that has no colorable, or even reasonable, likelihood of success on the merits is not entitled to recover attorney's fees if the defendant simply complies with the plaintiff's demands and moots the case for reasons that have nothing to do with the potential merit of the suit. Whether activated by economic, political, or purely personal concerns, a defendant may choose voluntarily to make the change sought in the suit rather than undergo protracted and expensive litigation.

A defendant who contends that his conduct was a wholly gratuitous response to a lawsuit that lacked colorable merit, must demonstrate the worthlessness of the plaintiff's claims and explain why he nonetheless voluntarily gave the plaintiffs the requested relief. Forcing the defendant to establish that the plaintiff has not presented a cognizable claim is consistent with the Federal Rules of Civil Procedure which allocates this burden to the defendant at every stage of the litigation.
Id. at 1153 (emphasis added) (footnote omitted).
The second standard to be applied in considering the question of entitlement to fees concerns the extent to which a lawyer can recover compensation for work performed in administrative proceedings. This question first arose in the City's Motion to Exclude from consideration in this case Plaintiffs' Claims for Attorneys' Fees for Legal Services Performed in Other Cases and Administrative Proceedings. The City argues in its Motion that fees were not available under  1988 for work performed in administrative actions. The Court denied the Motion. Since the Motion was denied, the Supreme Court decided Webb v. Board of Education of Dyer County, 471 U.S. 234, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985). The City in its Brief on Attorneys' Fees argues on the basis of Webb that attorneys' fees are not available for any administrative work in the case at bar. The Court disagrees that Webb precludes any compensation for this work and likewise concludes that it is not an absolute bar to recovery of payment for services performed before an administrative agency. Further, this Court will discuss the Fifth Circuit's most recent decision on administrative work, Arriola v. Harville, 781 F.2d 506 (5th Cir.1986)
Webb involved the termination of a black teacher's employment. The teacher claimed that his firing was unjustified. He challenged his dismissal by way of appeal to a state board. The teacher appeared before the board with his lawyer, but obtained no relief. Subsequently, suit was filed in federal court, complaining of both the dismissal and the board's allegedly racially based decision. Plaintiff received damages and his lawyer petitioned for fees under 42 U.S.C.  1988. The Supreme Court ultimately ruled that the lawyer was not entitled to fees under  1988 for the work he did before the board. Although the Supreme Court did not specify its reasons for denying the fee request, it did note that:
Congress only authorized the district courts to allow the prevailing party a reasonable attorney's fee in an "action or proceeding to enforce [ 1983]." Administrative proceedings established to enforce tenure rights created by state law simply are not any part of the proceedings to enforce  1983....
Id. at 1928 (footnote omitted).
* * * * * *
When the attorney's fee is allowed "as part of the costs" ÔÇö to use the language of the statute ÔÇö it is difficult to treat time spent years before the complaint was *543 filed as having been "expended on the litigation" or to be fairly comprehended as "part of the costs" of the civil rights action.
Ibid.
* * * * * *
The petitioner made no suggestion below that any discrete portion of the work product from the administrative proceedings was work that was both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached before settlement.
Id. at 1929.
What, then, does Webb say to courts deciding fee petitions? It clearly does not say that no one may ever collect fees for time expended in administrative proceedings. The Court's conclusions in Webb were limited to the facts of that case. It also, at least implicitly, endorses the idea that materials from a proceeding for which one could not normally receive compensation under 42 U.S.C.  1988, if used in a proceeding for which a fee award is available, may be compensable. Id. at 1928-29.
And, by allowing the award to Webb's lawyer for a case that settled, the case supports the practice of awarding fees for cases where non-trial procedures such as settlement win the day for a plaintiff.[6] The Second Circuit addressed the specific question of preclearance review proceedings which lead to settlements:
Arguably, where the initiation of litigation is necessary to compel defendants to obtain preclearance before holding an election, lobbying efforts in a preclearance review might bring the litigation to a quick and successful end, a goal consistent with the statutory purpose of Section 1973 1 (e).
Gerena-Valentin v. Koch, 739 F.2d 755, 759 (2nd Cir.1984).[7] The Fifth Circuit found it unnecessary to reach the question of whether attorney's fees can ever be awarded for participation in a preclearance review. Posada v. Lamb County, Texas, 716 F.2d 1066, 1074 (5th Cir.1983).[8]
Opinions that have been rendered since the hearing on the Motion for Attorneys' Fees have been reviewed and considered and do not affect the Court's decision awarding fees to the Plaintiffs.
The first such case is Arriola v. T.L. Harville, 781 F.2d 506 (5th Cir.1986). Arriola *544 does not call for a different result ÔÇö the Fifth Circuit expressly so holds:
As will be evident from our later discussion, this holding does not preclude compensation for services rendered in a preclearance submission that bear directly on the issues in an independent lawsuit and where that work is required and necessary to resolve the issues of the independent lawsuit.
Id. at 507 n. 1. The services performed by counsel for the Plaintiffs in their efforts before the Department of Justice were part and parcel of the ongoing litigation in the federal courts. Basically the issue was whether the totally at-large system of electing persons to sit on the City Council must be modified as a matter of law. Counsel for Plaintiffs had to proceed on various fronts contemporaneously.
In Arriola the Fifth Circuit found that Plaintiffs there had received a final judgment of exactly the relief they had sought ÔÇö an injunction. (The only relief they could have received in a  5 suit such as theirs.) Plaintiffs had sought to characterize their involvement in the preclearance process as the "remedy phase" of the litigation. Id. at 511. The Fifth Circuit found this characterization "artful" but held that Plaintiffs efforts in the preclearance process "could not have been useful or required for the litigation." Id. at 511-12.
This Court finds the cases before it to be proper candidates for the recovery of attorney fees in accordance with Arriola and Webb. Services performed before the Justice Department for preclearance submissions occurred while the various parties were pursuing their judicial remedies. The work done before the Justice Department was a direct catalyst of change necessary to the resolution of the lawsuits.
Two very recent cases of the United Supreme Court are also of relevance: City of Riverside v. Rivera, ___ U.S. ___, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) and Thornburg v. Gingles, ___ U.S. ___, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Riverside, reaffirms the use of the "lodestar approach," provides further instruction on who is considered to be the prevailing party, and recognizes the continued viability and appropriateness of the use of the "multiplier." Thornburg constitutes a continuing recognition of the importance of the use of experts and of the factors initially enunciated Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974).
Having discussed the first two questions, i.e., (1) when is a party to be considered as "prevailing" and (2) for what services, if any, performed by an attorney before an administrative agency are compensable, the Court turns to the second two questions: the computation of fees under Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974) and the extent to which the "multiplier" affects those Johnson factors.
Preliminarily, the question is whether the factors outlined in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974) as guideposts in fee awards have survived Blum v. Stenson, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The City argues that the factors did not, while Plaintiffs' lawyers argue that Johnson is still good law. The City takes the position that the "lodestar" approach is the exclusive method of allocating fees. The Court rejects that argument, finds ample support for the continued viability of Johnson, and considers that it must discuss those factors. The Court considers that Blum did little to alter the fundamental premise of Johnson.
Johnson has, since its inception, been the leading case in the Fifth Circuit on attorney's fees. The Johnson court listed twelve factors which district courts making fee awards were to consider: 1) time and labor required; 2) novelty and difficulty of the questions; 3) skill requisite to perform the legal service properly; 4) preclusion of other employment by the attorney due to acceptance of the case; 5) customary fee; 6) whether the fee is fixed or contingent; 7) time limitations imposed by the client or the circumstances; 8) *545 amount involved and results obtained; 9) experience, reputation, and ability of the attorneys; 10) "undesirability" of the case; 11) nature and length of the professional relationship with the client; and 12) awards in similar cases. Johnson, 488 F.2d at 717-19.
Johnson has not escaped criticism, however. Several commentators have expressed reservations about the factors.[9] Courts have also criticized Johnson. In Northcross v. Board of Education of the Memphis City Schools, 611 F.2d 624, 642-43 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980) the court expressed its concerns as follows:
We have learned through experience, however, that merely providing a check list of factors to consider does not lead to consistent results, or, in many cases, reasonable fees. Many of the factors are overlapping, and there is no guidance as to the relative importance of each factor, or indeed, how they are to be applied in a given case. We conclude that an analytical approach, grounded in the number of hours expended on the case, will take into account all the relevant factors, and will lead to a reasonable result. The number of hours of work will automatically reflect the "time and labor involved," "the novelty and difficulty of the question," and "preclusion of other employment." The attorney's normal hourly billing rate will reflect "the skill requisite to perform the legal service properly," "the customary fee," and "the experience, reputation and ability of the attorney."
District Courts, with the initial responsibility for applying the factors, have also found fault with the Johnson test:
The Fifth Circuit has repeatedly insisted that the Johnson factors control the district courts' computation of attorneys' fees. Although these criteria remain central to any fee determination, we conclude that the consideration of these factors, without more, cannot guarantee a rational, reasonable setting of fees. See Copeland v. Marshall, 641 F.2d 880, 890 (D.C.Cir.1980) (en banc).
"The fundamental problem with an approach that does no more than assure that the lower courts will consider a plethora of conflicting and at least partially redundant factors is that it provides no analytical framework for their application. It offers no guidance on the relative importance of each factor, whether they are to be applied differently in different contexts, or, indeed, how they are to be applied at all." Copeland v. Marshall, 641 F.2d at 890.
District judges for this reason, have had difficulty applying the Johnson factors. Id.

Riddell v. National Democratic Party, 545 F.Supp. 252, 255-56 (S.D.Miss.1982), rev'd in part on other grounds, 712 F.2d 165 (5th Cir.1983).
Since Johnson the Fifth Circuit has incorporated the twelve factors into the "lodestar" analysis employed by many circuits. As the Fifth Circuit explained in Copper Liquor, Inc. v. Adolph Coors Co., 624 F.2d 575, 583 n. 15 (5th Cir.1980):
The Johnson test, as interpreted in First Colonial, is similar to the Third Circuit's "lodestar" method of computing attorneys' fees. See Lindy Bros. Bldrs., Inc. v. American Radiator & Standard Sanitary Corp., 3[d] Cir.1976, 540 F.2d 102, 112-18; Lindy Bros. Bldrs., Inc. v. American Radiator & Standard Sanitary Corp., 3[d] Cir.1974, 487 F.2d 161, 167-69; accord, City of Detroit v. Grinnell Corp., 2[d] Cir.1977, 560 F.2d 1093, 1098-1103; City of Detroit v. Grinnell Corp., 2[d] Cir.1974, 495 F.2d 448, 469-74; Grunin v. International House of Pancakes, 8[th] Cir., 513 F.2d 114, 128-29, cert. denied, 1975, 423 U.S. 864, 96 *546 S.Ct. 124, 46 L.Ed.2d 93; Knutson v. Daily Review, Inc., N.D.Cal.1979, 479 F.Supp. 1263, 1268-72. Under the "lodestar" analysis, the district court must first [sic] determine the number of hours reasonably spent by the plaintiff's attorney on matters upon which the plaintiff was successful. Next, the court must ascertain the value of the attorney's time based on his or her normal billing rate. If a number of attorneys are involved, the court may use different rates to reflect the different amounts of skill, expertise, and experience possessed by the different attorneys. The court then must determine the "lodestar" amount by multiplying the hours spent by each attorney on the case by his or her respective hourly rate. Before arriving at a final award, at least two other subjective factors must be considered. The first is the contingent nature of success. The second factor is the extent to which any exceptionally positive or negative quality of an attorney's work mandates increasing or decreasing the lodestar. A fact to be considered in making this adjustment is the amount recovered in damages as compared to the defendant's potential liability. See Knutson v. Daily Review, Inc., 479 F.Supp. at 1269-70. See generally Comment, Attorneys', Attorneys' Fees in Individual and Class Action Anti-trust Litigation, 60 Cal.L.Rev. 1656 (1972).
Some have suggested that the "lodestar" approach and Johnson are two wholly different methods of determining what to award a prevailing party's lawyer. See New Approaches to Attorney's Fees: The Judge's Role in Class Actions, 24 The Judges' J., 12, 14-15 (describes "lodestar" theory and calls Johnson "another mode of analysis"). Others, the Court feels correctly, consider that Johnson and the "lodestar" approach complement one another. Comment at 832 (footnote omitted) ("The `lodestar' method does not conflict with Johnson but furnishes an orderly regimen for examination of the factors listed."). In integrating the "lodestar" method and Johnson, the Court awarding fees must undertake a three-step analysis:
The Court of Appeals of the Fifth Circuit, progenitor of the Johnson factors has recognized these problems. It therefore has instructed district courts to first ascertain the nature and extent of the services supplied by the attorney from a statement showing the number of hours worked and an explanation of how these hours were spent. The court should next determine the customary hourly rate of compensation. These are essentially Johnson facts 1 and 5. The court should then multiply the number of hours reasonably expended by the customary hourly rate to determine an initial amount for the fee award. Finally, the court should adjust the fee on the basis of the other factors, briefly explaining how they affected the award. In re First Colonial Corp. of America, 544 F.2d 1291, 1298-1300 (5th Cir.1977). See also Copper Liquor, Inc. v. Adolph Coors Co., 624 F.2d 575, 581-84, (5th Cir.1980).
Anderson v. Morris, 658 F.2d 246, 249 (4th Cir.1981). See also Tasby v. Wright, 550 F.Supp. 262, 275 (N.D.Tex.1982) (Johnson test similar to "lodestar" three-step method of computing attorneys' fees); Comment at 832 (though Johnson does not specifically require the "lodestar" approach, factors 1 and 5 embrace its component parts). See generally Copper Liquor, 624 F.2d at 583 (the Johnson test is similar to the "lodestar" method of computing attorneys' fees). "... There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the `results obtained'." Hensley, 103 S.Ct. at 1940. The opinion continues in a footnote to adopt an approach somewhat like the Fifth Circuit's, but with a caveat as to duplication:
The district court also may consider other factors identified in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719 (CA5 1974), though it should note that many of these factors usually are subsumed within the initial calculation *547 of hours reasonably expended at a reasonable hourly rate. See Copeland v. Marshall, 205 U.S.App.D.C. 390, 400, 641 F.2d 880, 890 (1980) (en banc).
Id. at n. 9.
Blum v. Stenson did not alter this course; it merely expanded on it. Blum acknowledged that upward adjustments are appropriate in some cases, Blum, 105 S.Ct. at 1548. However, several Johnson factors were described as being properly taken into account in determining the base rate and not the multiplier including novelty and complexity of the issues[10] and results obtained.[11]
Thus, although the Supreme Court has reshuffled the Johnson factors somewhat, the factors are still alive and well. This Court cannot agree with the City's reliance on Patrick v. Board of Trustees of the Mineola Independent School District, 603 F.Supp. 754, 759 (E.D.Tex.1984), which states,
Before Blum, a court was required to direct light from the lodestar through the twelve filters enumerated in Johnson, in order to determine whether an overall adjustment of the product of hours-times-rate was necessary to make fees reasonably compensatory. In Blum, the court held that the prevailing hourly rate in the community already subsumes most of the factors listed in Johnson, id. The only Johnson factor to survive Blum is contingency, that is, the degree of risk that the action will be unsuccessful, and also that payment will be delayed.
The Supreme Court, for instance, specified in Blum that a multiplier would be available for exceptional success and quality of service "superior to that one reasonably should expect in light of the hourly rates charged...." Blum, 104 S.Ct. at 1549. Contingency therefore cannot be the only Johnson factor left after Blum. Consequently, the City errs in the position taken in its briefing by not addressing to any degree the Johnson factors.[12]
The last of the four questions the Court must examine before applying the applicable law to the facts concerns the role of the "multiplier." The City's argument here is inconsistent. The City argues in its brief that "in a civil rights attorneys' fees setting only one contingency risk is present, the risk of non-payment." (Defendant's Brief, pp. 75-76) The City discusses shortly thereafter the division of the circuits "on the question of whether a contingency multiplier based on risk of loss is available," Id. at 76. The City never states what its position is. Presumably, its position would be that a multiplier based on risk of loss is available. But why, then, would Hensley and Blum both reaffirm that multipliers are still available,[13] if risk of loss is the only risk left?
The Court is persuaded that risk of loss is still compensable via a multiplier. The Supreme Court expressly left this question open.[14] The Fifth Circuit has explicitly stated that "the contingent nature of [the] suit" figures into the Multiplier, and that "[u]nder the rubric of `the contingent nature of success' the district court should appraise the professional burden undertaken ÔÇö that is, the probability or likelihood of success, viewed at the time of filing suit." Graves v. Barnes, 700 F.2d 220, 222 (5th Cir.1983); see also Jones v. Diamond, 636 F.2d 1364, 1382 (5th Cir. 1981) (en banc) ("Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more *548 than those who are assured of compensation regardless of result. This is neither less nor more appropriate in civil rights litigation than in personal injury cases."); Tasby v. Wright, 550 F.Supp. at 276 (defining "the contingent nature of the employment, i.e., the recovery of attorney's fees by applicants was wholly contingent upon their prevailing in the litigation...."). C.f. Nicholson v. Bates, 544 F.Supp. 256, 259 (E.D.Tex.1982) (case deemed not contingent because lawyers realized from the outset that Plaintiff could not pay their fees). The Fifth Circuit has recently once again recognized the propriety of enhancement of a fee award for the potential of the Plaintiff not prevailing. The application of the multiplier as a part of Johnson factor (6) is thus clearly appropriate.[15]

II. The application of the standards to the case at bar.
Having discussed the four legal questions this Court has to consider in determining the propriety of the award of attorneys' fees to the Plaintiffs, the resulting standards must be applied to this case. Rather than undertake a discrete exegesis of the pertinent facts, the Court will discuss the facts in conjunction with its legal conclusions. The Court will first set out the reasons that Plaintiffs' lawyers are entitled to an award of fees. Then the Court will discuss what amount is due the lawyers.
Until the mid-1950's the City of Houston ("the City") elected the members of its City Council from residency districts. The City then changed its method of electing the members of its City Council to a system whereby all candidates for City Council ran at-large. (Tr. vol. 7, p. 21) Many minorities thereafter began to work for the adoption of single-member districts. For example, the State Legislature in 1973 and 1975 was presented with bills to change the method of election of City Council members to a single-member district scheme. Then State Representatives Anthony Hall, Ben Reyes, and Craig Washington all introduced such bills. (Tr. vol. 3, pp. 21-22) Similar bills had changed the method of electing members of the board of the Houston Independent School District to election by single-member districts. (Tr. vol. 9, pp. 157-58) However, there was great resistance to the '73 and '75 bills from the City in the Legislature. The influence of the City against the single-member district bills proved fatal to the bills. For example, lobbyist Jim Short used his influence against the bills, and the City swayed the necessary votes that insured that Houston's method of electing its City Council members would not change. (Tr. vol. 3, p. 35) In 1975, the City held a straw vote to determine whether the population wished to change the method of electing City Council members from at-large to single-member. The straw vote proved favorable to single-member districts. However, the City took no action to change the method of electing City Council members in accord with the wishes of the populace as expressed in the straw vote. (Tr. vol. 3, pp. 35-36) Nevertheless, politicians of the time, have maintained that they would have proposed single-member districts, but for the lack of support, and that the political process itself would have eventually caused those districts to be created anyway. The Court concludes that the support was there but the politicians responsible for the change were not. See discussion infra. After the 1975 referendum, many citizens tried to get enough signatures to change the charter and change the method of election to single-member district. The petitions failed, due to an inadequate number of signatures. (Tr. vol. 3, p. 68)
The other attempts to get the City to adopt single-member districts having failed, the minority community turned to litigation as is next recourse. In 1973, Herman Lauhoff, the President of the Greater Houston Civic Council of Organizations[16], a community group composed in *549 large part of minorities, and Neal West asked Al Greene to look into the possibility of a suit to challenge the constitutionality of at-large elections of City Council members in Houston. Al Greene initially worked alone; Mr. Greene ultimately appealed to George Korbel to help him in the lawsuit, and Mr. Korbel in turn brought Mr. Botello into the case. Frumencio Reyes and Craig Washington later joined the group. Mr. Greene also asked the Mexican-American Legal Defense Fund ("MALDEF") for help, but MALDEF was not able to aid the litigants.
The first case, G.H.C.C.O. v. Mann, C.A. H-73-1650, was a challenge under the Fourteenth Amendment of the United States Constitution to at-large election of members of the City Council. Mr. Greene initiated the case. The other lawyers worked with Mr. Greene thereafter, garnering evidence and preparing witnesses. Finally, all the lawyers devoted themselves to the trial of the case before the Honorable Allen B. Hannay, who is now deceased. That trial took place in 1977. That Court entered judgment for the City. The case was appealed to the United States Court of Appeals for the Fifth Circuit. The Department of Justice ultimately filed an amicus curiae brief in the case before the Fifth Circuit, taking the Plaintiffs' position. Houston subsequently adopted a single-member and at-large method of electing City Council members and mooted the case while it was pending before the Fifth Circuit.[17] The record indicates that the parties perceived a strong possibility existed that the case would have been remanded for a new trial. That, for example, was the view of the lead attorney for the Plaintiff, Mr. Greene. In addition, the Court is cognizant that the Fifth Circuit sent back many such cases for retrial during the relevant period for necessary fact findings. (Tr. vol. 7, pp. 129-30) And the Court notes that the City's three projected scenarios for Mann's probable disposition in the Fifth Circuit would have involved a remand. Fred Hofheinz, the Mayor of Houston during the period, stated that, after trial, the City considered 73-1650 not to be a live case and felt confident of victory. (Tr. vol. 8, p. 114) However, the Court notes that evidence in the record clearly indicates that the City had hired expert witnesses, the consulting firm of Hamilton & Rabinowitz, to assist in the retrial. The City contends that the evidence of their hiring Hamilton & Rabinowitz does not clearly show that they anticipated retrial, arguing that the contract does not clearly show that 73-1650 was the case for which Hamilton & Rabinowitz, Inc. was hired. Nevertheless, the Court notes that the City spent over $63,000.00, (Tr. vol. 7, p. 130), for the contract and that the City's budgetary notations regarding that contract referred to Hamilton & Rabinowitz's "professional consulting services in connection with the analysis of issues raised by litigation, administrative proceedings and legislation [sic] relating to boundary changes by the City." (Plaintiffs' Exh. 32) The Court was told and heard no evidence to the contrary that the only case outstanding at the time against the City of Houston concerning boundary changes was 73-1650. (Tr. vol. 8, p. 21) Thus, the Court can only conclude that these expenses were indeed incurred in anticipation of and preparation for a retrial of 73-1650.
The Court has reviewed the late Judge Hannay's decision. Although this court may have realized a different conclusion, that is not the task with this Court. The fact remains, however, that retrial appeared to the parties to be likely, and this likelihood significantly affected the City's decision to change its system of electing City Council members from all single-member districts.
In 1975, the Plaintiffs once again attempted to get via litigation single-member districts in the City of Houston. They filed the case numbered H-75-1731, which was also styled Moses Leroy v. The City of Houston. In this case, the Plaintiffs *550 sought an injunction under  5 of the Voting Rights Act, 42 U.S.C.  1973c. The case concerned elections that had added newly-annexed areas to the City of Houston. The three-judge panel that heard the request for injunction on October 30, 1975 refused that request, noting the great expenditure of resources on the election that had already taken place and stating that the Court would invalidate the elections if the Department of Justice refused to preclear the election changes. The Department of Justice eventually precleared the election changes. The case was therefore closed.[18]
The Court notes that the point of all these cases was to get Houston to change the at-large system as a way of electing the members of its City Council. The materials prepared for each of these cases was later used by the Department of Justice. In addition, it is important to note that the City was inundated with complex litigation by the Plaintiffs at all times. The record persuades the Court beyond doubt that it was these cases, coupled with the case described below, that enabled the Department of Justice to take the actions that ultimately forced the City to adopt some single-member districts as a method of electing its City Council, and, in addition, that the cases themselves directly catalyzed the City into changing its method of electing City Council members.
Events moved very swiftly in 1977-78, providing the impetus for the City of Houston to make changes in the election of City Council members, as the Plaintiffs sought. A short overview of the events of that period would show that the City of Houston annexed parts of Clear Lake City on December 30, 1978; Plaintiffs then took the City to court and the Department of Justice joined the suit; using the record in Mann, C.A. No. 73-1650, the Department of Justice objected to the City's annexations; and the City therefore had to change its charter to elect the majority of the members of its City Council from single-member districts.[19] After that time, the case at bar was remanded for determination on attorneys' fees. To make this brief overview is not to slight the importance of the course of events that has brought the litigants before the Court. The Court will examine in relative detail the critical events of the period, as it is those events that justify an award of attorneys' fees to Plaintiffs.
In order to understand the events leading up to the instant motions, it's necessary to understand the workings of the Voting Rights Act. That Act, which was extended to Texas in 1975, (Tr. vol. 1, p. 92), has a terrific impact upon jurisdictions it covers. Fundamentally, section 5 of the Voting Rights Act provides that covered jurisdictions either preclear with the Justice Department all changes that will affect voting before those changes are implemented or file an action for a declaratory judgment in the District Court for the District of Columbia, requesting the Court to declare that the changes adversely affect minority voting strength. If in the preclearance process the Department finds that the changes would not significantly act to the detriment of minorities' voting power in the covered jurisdiction, the Department will preclear the changes; the changes can then be put into effect. However, if the *551 changes are objected to, the jurisdiction must take further action before any sort of election can proceed. A jurisdiction whose changes fail to win approval may opt to implement its changes and chance being sued by the Department of Justice or private parties. (Tr. vol. 1, p. 93-94) Many cases brought to enforce the provisions of the Voting Rights Act are brought by private litigants. Cases under section 5 of the Act are usually less complicated than cases under section 2, (Tr. vol. 1, pp. 80-81), because there are only two issues under section 5, i.e., whether voting changes in covered jurisdictions have been enacted and whether there has been a preclearance of those changes. The issues in C.A. No. H-78-2174 were particularly clear, because the City had made no attempt to preclear the changes that it had made in the voting structure by annexing additional areas. (Tr. vol. 7, p. 195)
When the Department of Justice is trying to decide whether to preclear a voting change, it generally looks at seven factors. The Department examines: 1) whether racially polarized voting exists in the jurisdiction; 2) what the electoral history of the region is; 3) whether having another method of election would make a difference in elections (for example, what the margins of victories of majority candidates have been and whether proposed election changes would have allowed minority candidates to prevail); 4) case studies; 5) whether past changes have discriminated against minorities; 6) the effect of run-offs in the jurisdiction; and 7) whether, in cases such as in the City of Houston, residency districts or other previously used election devices had actually benefited minority constituents. (Tr. vol. 3, pp. 74-75) The key element in the Department of Justice's determination in a case such as the City of Houston's is to determine whether there is racially-polarized voting.[20] (Tr. vol. 1, pp. 100-01) Racially-polarized voting is voting that is based on race to the virtual exclusion of other factors. One determines whether racially-polarized voting exists from a number of factors, such as the local history of discrimination, the degree of responsiveness of local officials to their constituents, the responsiveness of those officials to the minority population in particular, the segregation of the community, and the political and social isolation in the community of the minorities. (Tr. vol. 1, p. 106-07) One determines whether racially-polarized voting exists as a statistical matter by a five-part process. First, one identifies the ethnic and racial composition of the precincts in the area. Then the race of each candidate is determined, and election data for each election is garnered. The next step is to determine whether the precinct has a significant number of other minorities, i.e., is racially pure; finally, one determines how the precinct voted in successive elections. If voting along racial lines has been prevalent, racially-polarized voting exists. (Tr. vol. 1, pp. 102-03) A good example of the elements that the Department of Justice examines is to be found in the case with the City of Houston.
The Department of Justice used many of the elements described above to determine whether to object to the City's annexations. For example, the Department looked at the City's employment patterns to determine whether racial segregation existed. (Tr. vol. 3, p. 182) The Department also looked at the City's old system of residency districts for City Council candidates to see whether black candidates had carried their districts. Tr. vol. 3, pp. 183-84) The Department found that they did, but lost city-wide. The Department also inquired about Judson Robinson and Leonel Castillo, two minority candidates who were elected in Houston city-wide, as a council member and city controller, respectively, and satisfied itself that these elections were aberrations. (Tr. vol. 4, p. 49) The Department examined the effect of run-off elections on minorities, comparing minority success with run-offs in City Council races with *552 success in Houston Independent School District, which did not have run-off elections. (Tr. vol 3, pp. 182-83) The Department also looked at why Houston had changed from using residency districts in the 1950's (Tr. vol. 3, pp. 183-84) and the general electoral history of Houston. (Tr. vol. 3, p. 175)
The process by which the Department of Justice examines this material is well-prescribed. The jurisdiction submits materials prescribed by regulations to the Justice Department. (Tr. vol. 1, pp. 84-85) The materials contain information about the changes and the jurisdiction. The Department has sixty days within which to object, not object, or ask for further information, (Tr. vol. 6, p. 70) The size of the jurisdiction in some part determines the degree of proof necessary; the more complicated the change and the larger the jurisdiction, the greater the scrutiny given. (Tr. vol. 1, p. 101) The Department of Justice reviews all voting changes in covered jurisdictions, even a change of a voting place from one building to another within the same precinct. (Tr. vol. 7, p. 190)
The resources the Department possesses to deal with the submissions are inadequate to deal fully with the submissions made. The Department of Justice received over 7,000 voting changes in 1979, and employs only 13 non-attorneys and between 10 and 14 attorneys to handle all these submissions. (Tr. vol. 6, pp. 59-60) Over 7,000 jurisdictions, 4,000 in Texas alone, make submissions. When many jurisdictions were added to the list of those already under the Voting Rights Act in 1975, no more persons were hired to help review submissions. (Tr. vol. 6, p. 74) Moreover, the Department has no budget for expert witnesses to help sort out the many knotty problems a submission may pose. (Tr. vol. 6, p. 79) Of course, the Department generally pays more attention to large submissions than to small ones, and keeps a continuing file on all jurisdictions subject to the Voting Rights Act. (Tr. vol. 7, p. 199) But the numbers above speak for themselves; the Department can scarcely keep up with the work that it has. For example, in the instant case, only David Hunter at the Department of Justice worked directly on the City's extensive submission. (Tr. vol. 7, p. 199) In sum, the Department is spread too thin to handle all the information it receives, and certainly did not have the resources to develop by itself the data regarding Houston which the submission at controversy in this case demanded. (Tr. vol. 3, p. 116; Tr. vol. 4, pp. 78-79)
The record clearly indicates that the Department, because of its limited resources, routinely relies on individuals in jurisdictions making submissions to provide invaluable information with which to judge the submissions. (Tr. vol. 6, p. 77) Reliance upon local persons is particularly heavy in large jurisdictions such as Houston. (Tr. vol. 1, p. 84; Tr. vol. 6, p. 69) In some instances, the Department of Justice calls people in localities whom the Department already knows. For example, the Department has often called organizations and private citizens to ascertain an opinion of a submitted voting change. (Tr. vol. 1, p. 83) However, the Department lacks sources of local information in many communities. Instead, it must ask its few contacts in an area for names of other persons who should be called. Id. Many who often deal with the Department, such as Jose Garza, consider that the Department relies particularly heavily on comments from lawyers in the locality. The Department often relies on lawyer's comments because those comments generally are written more with an eye to the law and offer more evidence in support of arguments than do those of non-lawyers. (Tr. vol. 1, p. 69; Tr. vol. 6, p. 77) And, without local input, objections are rare. (Tr. vol. 1, p. 84)
Another effect of the limited resources available to the Department of Justice is that the Department often is unable to sue all jurisdictions which do not comply with section 5. (Tr. vol. 7, p. 7) The cases are too numerous and, many times, burdensome in terms of amount of evidence for the Department to handle. (Tr. vol. 6, p. 67) And when the Department does move to enforce, its efforts are frequently unavailing. *553 For example, in Crockett County, Texas, the Department moved to enforce its objection under section 5, but, misunderstanding the local situation, took actions that actually undercut minority voting strength. (Tr. vol. 7, pp. 204-05) In addition, the Department is often not as quick to request injunctions as private parties. (Tr. vol. 7, p. 204) As a result, testimony indicated that the Department generally does not initiate its own section 5 enforcement proceedings. Rather, it files amicus briefs or intervenes after locals have moved to enforce section 5. (Tr. vol. 1, p. 98) And such intervention is relatively rare. (Tr. vol. 7, p. 8) The Court is persuaded here that the intervention did little to add to the Plaintiffs' lawyers efforts. See discussion infra.
Houston underwent the above-described review in 1978 because Plaintiffs filed C.A. 78-2174. C.A. 78-2174 concerned election changes resulting from the annexation of Clear Lake City, changes which had not been precleared.[21] The three-judge panel that heard 78-2174 refused an initial request for injunction because the City withdrew its ordinance calling an election. However, it was at this point clear to the City from the three-judge panel that, were an election called without preclearance of election changes, an injunction would issue. The City made its submission. The Justice Department objected to the submission, due in large part to the Plaintiffs' litigation efforts. On July 11, 1979, the City did call an election without having precleared its election changes, and the three-judge panel enjoined the election on July 19, 1979. (Tr. vol. 6, p. 14)
The Department of Justice did file a companion suit, C.A. 78-2407, and, on December 13, 1978, moved to consolidate with 78-2174 and advocated the Plaintiff's position. (Tr. vol. 7, pp. 197-198. The cases were consolidated on December 15, 1978. However, there was no division of labor between the Justice Department and Plaintiffs. The Department merely intervened to add its voice on the side of the Plaintiffs. (Tr. vol. 6, p. 32) The Plaintiffs did the substantive work. Thus, although the City was forced to deal with the Department of Justice to attempt to obtain preclearance of the voting changes, the Plaintiffs were the ones who actually did the forcing.
In order to understand the events that transpired during the period before the injunction issued, one must understand the annexations the City made. Annexation of outlying areas was a top priority of the City during the relevant period. In testimony, witnesses stated that one or two of the members of the Houston City Council may have opposed the City's aggressive policy of annexation, but by and large the Council and the Mayor(s) were firmly behind annexations. (Tr. vol. 8, pp. 134-35) For example, the City annexed much territory during the administration of Fred Hofheinz. (Tr. vol. 8, p. 97) Mayor Hofheinz stated before the Court that annexation was necessary in order to protect Houston's tax base (Tr. vol. 8, p. 98) and testified that he felt that the annexations benefited both Houston and the county. (Tr. vol. 8, pp. 104-05) Similarly, the Mayor who succeeded Hofheinz, Jim McConn, favored aggressive annexation. (Tr. vol. 9, p. 181) Mayor McConn stated that he also felt that annexations were necessary in order to protect the City's tax base. (Tr. vol. 9, p. 181) Support from the Houston City Council was evidenced by the testimony of Councilman Judson Robinson, who stated that he approved of Houston's aggressive annexation policy. (Tr. vol. 8, p. 139) So, for example, on December 28, 1977, Houston annexed the Aldine/Greenspoint Mall area, Inwood Forest/Candlelight Forest, Scarsdale, and Briarwick. (Tr. vol. 10, pp. 46-47) These annexations added to Houston approximately 140,000 people. (Tr. vol. 10, p. 55) The Clear Lake City annexation brought the situation at bar to a head.
Because the Voting Rights Act was extended to cover Texas in 1975, Houston had to preclear the annexations that it made *554 retroactive to 1972. Houston had therefore submitted changes to the Department of Justice before Houston undertook to annex Clear Lake City. Both City Attorney Robert Collie and Mayor McConn knew that the City would have to preclear any election changes caused by annexations. (Tr. vol. 10, p. 105; Tr. vol. 9, p. 162) The Department had precleared the changes before Clear Lake (Tr. vol. 8, p. 80) but the Clear Lake City annexation did not go so smoothly.
There were two steps in the Clear Lake City annexation. The first step was the annexation of a strip of land in Clear Lake. The Department of Justice approved the strip annexation on October 28, 1977, but by letter to the City of Houston, noted that, were a larger area annexed, objections could be lodged under the Voting Rights Act.[22] (Tr. vol. 8, pp. 100-01) (Defendants' Exh. 1) This letter raises an important question: would the Justice Department actually have undertaken to move the City to adopt single-member districts without the Plaintiffs' intervention? Present conclusions about what actions may have been taken in the past are difficult, but the record indicates nothing to support an affirmative answer. The Department relied heavily on the information the Plaintiffs supplied in objecting. Without an objection, no remedy of adopting single-member districts would have been discussed. In addition, the information generated from the pending litigation which Plaintiffs supplied manifested once and for all the appropriateness of single-member districts.
The Department found the strip annexation unobjectionable because few people lived there. (Tr. vol. 8, p. 103) Altogether, approximately 20,000 people lived in Clear Lake City at the time of the annexation (Tr. vol. 10, pp. 25-26), most of them white. Tr. vol. 8, p. 104) The purpose of the strip annexation was to take so much of Clear Lake City's land that Clear Lake could not incorporate and avoid annexation by Houston. (Tr. vol. 10, p. 23) The 1977 Texas Legislature actually forced Houston to annex the remainder of Clear Lake City. The Legislature passed a law that meant that Houston had to annex before 1979 or lose Clear Lake forever. (Tr. vol. 8, pp. 98-99) Houston, therefore, annexed Clear Lake City on December 30, 1977.
Before Houston could hold a much-needed bond election, the annexation of Clear Lake City had to be submitted to the Justice Department. The City wished to hold a critical bond election (Tr. vol. 9, p. 184) Houston, as do other municipalities, pays for its expenditures through bonds. The City had little money available and without a bond election could not pay its debts. Judson Robinson testified that the Houston City Council was very worried because it knew that several cities had not been able to have elections for years because of problems with the Department of Justice and they knew that Houston could not function without the bond issue. (Tr. vol. 8, pp. 147-48) City Attorney Collie testified that in his opinion as City Attorney such an election not involving recently-annexed areas would not be legal. (Tr. vol. 9, pp. 228-231) In any event, Collie testified further, the City did not want a cloud over its bonds from a bond election having been held only in parts of the City. (Tr. vol. 9, pp. 233-34) Thus, although opinions on the *555 City Council of Houston varied from going to court in the District of Columbia to negotiating with the Justice Department (Tr. vol. 9, pp. 222-23), it was clear that the City's best option was to negotiate with the Department. And, at that point, it was also clear that the Clear Lake City annexations could be used to force the City to adopt single-member districts. Senator Craig Washington described the annexations as having leverage and having the City "by the throat" because of the City's need for a bond election and the Department of Justice's refusal to preclear the annexations. (Tr. vol. 3, pp. 69-71)
City Attorney Collie was in charge of the actual preparation under submission. (Tr. vol. 9, p. 160) Before the submission was sent in, the Department of Justice wrote to ask why Houston had not yet submitted the annexation; the City replied that it was working on the submission. (Tr. vol. 10, pp. 27-28) The submission was finally sent to the Department of Justice in February of 1979. (Tr. vol. 10, p. 148) The Plaintiffs entered the preclearance process at this point. The Plaintiffs at first sent letters and telephoned the Department officials, and later actually met with persons reviewing the submission. Evidence in the record indicates sustained contact between Plaintiffs and the Justice Department. Mr. Washington testified that his clients asked Plaintiffs' counsel to go to the Department of Justice concerning the situation soon after the loss at trial. (Tr. vol. 3, pp. 27-28) After it became clear that the Department of Justice was going to come into the 73-1650 on appeal, and while the Department of Justice was studying the objection, the Plaintiffs rendered invaluable aid to the Department by giving them information that the Department would not have had otherwise. For example, the Plaintiffs gave the full record in 73-1650 to the Department of Justice (Tr. vol. 3, p. 99) and this time record was replete with evidence that the Department utilized regarding racially-polarized voting in Houston. The reliance of the Department of Justice on Plaintiffs is further evidenced by the fact that the Department frequently contacted some of the Plaintiffs' witnesses in 73-1650 while they were considering the City's submission. For example, Mr. Chandler Davidson testified that he spoke several times with David Hunter and Gerald Jones of the Department of Justice. (Tr. vol. 3, p. 180) In addition, one of Plaintiffs' attorneys, Mr. Al Greene, travelled to Washington to apprise the Department of Justice of the situation in Houston, and gave names of community leaders and contacts to the Department; the Department later contacted several of these persons. (Tr. vol. 5, pp. 109-10) The attorneys for the Plaintiffs also met with Department of Justice attorneys in Houston before the objection was lodged. (Tr. vol. 6, pp. 18-20)
The Department of Justice objected to the City's submission on June 11, 1979. (Tr. vol. 6, p. 27) Shortly thereafter, the City asked the Department to withdraw its objection. (Tr. vol. 6, p. 23) The City sent representatives to meet with the Department of Justice to argue for reconsideration. The City Attorney, the Mayor and members of the City Council, including Judson Robinson, were at that June 20, 1979 meeting. (Tr. vol. 6, pp. 27-28) (Tr. vol. 8, pp. 143-47; Tr. vol. 9, p. 240) The Mayor and the City Council asked the Department of Justice to exclude the Plaintiffs from the meeting; an unusual measure. (Tr. vol. 9, p. 240) During the meeting, the City discussed the submission and various single-member district plans with the Department of Justice. (Tr. vol. 9, pp. 223-25) This meeting was Mayor McConn's only conference with the Department, but the City Attorney met with the Department several times. (Tr. vol. 9, p. 194) The Plaintiffs also met in Washington with the Department of Justice regarding the submission on June 20, 1979. (Tr. vol. 7, pp. 113-14) At that meeting were Ben Reyes, Moses Leroy, E.M. Knight, Chandler Davidson, Herman Lauhoff, Mickey Leland, and George Korbel. (Tr. vol. 7, pp. 113-16) Before the meeting, it appeared that the Justice Department representatives were in a hurry and felt that Plaintiffs had little to offer the Department. (Tr. vol. 3, p. 116) *556 Ben Reyes perceived during the meeting that the Department did not grasp the situation in Houston until studying the Plaintiffs' information. Reyes felt that the Department's representatives' demeanor changed and that those representatives became more interested in the situation after hearing the Plaintiffs. (Tr. vol. 3, pp. 98, 116-117) Similarly, Mr. Davidson perceived that the Department of Justice did not have information critical to its determination on acceptability of the submission. Department of Justice representatives asked questions, such as who the minority candidates in Houston had been before and after the changes effected in the 1950's. (Tr. vol. 3, p. 185) Dr. Davidson could tell from the questions they asked that they were quite ignorant of the situation in Houston. (Tr. vol. 3, p. 186) Dr. Davidson perceived that Mr. Hunter knew only what was in the City's submission before the meeting. Overall, it was the impression of the Plaintiffs that the meeting substantially changed the way the Department of Justice perceived the situation, and that the information that the Plaintiffs had gathered for litigation substantially altered the viewpoint of the Department of Justice regarding the City's submission. The Department's contacts with Plaintiffs' counsels and experts after the meeting, See infra, reinforced that impression which the Court finds credible.
The Department of Justice refused on July 18, 1979 to reconsider its objection. (Tr. vol. 7, p. 122) After all the meetings and discussions with the Department, discussions in Houston regarding the adoption of specific single-member district plans commenced. On July 20, 1979, the Council placed the nine/five[23] plan on the ballot for an August election, along with seven other propositions. The negotiations were between the Plaintiffs and the City in private sessions, as well as with many other people in public and private. (Tr. vol. 9, pp. 166-67) Ultimately, the Department of Justice precleared the annexation after the present plan was passed at an election on August 11, 1979. (Tr. vol. 5, pp. 137-38) Subsequently, the bond election occurred, and the City raised the money needed to conduct City operations. (Tr. vol. 5, pp. 137-38)
The Court has thoroughly reviewed the record in the case at bar and agrees with the Plaintiffs' contention that the instant cases caused the Department of Justice to take its actions against the City and thereby move the City to adopt a method of electing some City Council members from single-member districts. (See Tr. vol. 2, pp. 49-50; Tr. vol. 3, pp. 72, 95-96) The Fifth Circuit's probable remand of 73-1650, continued pressure of litigation every time annexations occurred, and 78-2174 were significant catalysts to adopting the single-member plan. (Tr. vol. 3, p. 33) As Mr. Greene stated during testimony, the Plaintiffs' goal was attaining single-member district elections. The Plaintiffs used different tools, such as litigation in '73, '75, '78, and then employed their litigation skills, materials, and records with the Department of Justice. (Tr. vol. 4, pp. 165-66) And it is of no little import that the Department of Justice itself considers the Plaintiffs to have prevailed in 73-1650. Voting Rights Act: Hearings on 5.53, S. 1761, S. 1975, S. 1992, and H.R. 3112 Before the Subcommittee on the Constitution of the Senate Committee on the Judiciary, 97th Cong., 2d Sess. 1804 (1985) (attachments to statement of William Bradford Reynolds, Assistant Attorney General, Civil Rights Division).
The City argues vehemently that the cases had nothing to do with the Department of Justice's actions or the City's adoption of single-member districts. However, the Court has examined the reasons that the City proffers as an alternative explanation for the Department of Justice's action, and rejects each. The Court will address each of these reasons, and then will enumerate and discuss the reasons which the Court considers compel the conclusion that *557 the litigation was instrumental in moving the Department of Justice to spur the City of Houston to change its method of electing its City Council.
The City contends first that it perceived that it would have succeeded against the Plaintiffs in litigation. Thus, the City was not moved to action by the lawsuits. (Tr. vol. 8, p. 88 (Day); Tr. vol. 8, p. 118 (Hofheinz); Tr. vol. 10, p. 118 (Collie)) However, this argument misses three points. The first point is that all parties agree that the immediate cause of the City's changing the method of selecting City Council members was the Department of Justice's objection to the annexations and blocking of the bond election. That blocking was brought about in major part because of the case, 78-2174, which the Plaintiffs commenced and prosecuted. Second, the City apparently perceived that it would have to retry 73-1650, and knew from experience that it would have to face challenges in court every time Houston annexed an area; as Houston wished to annex aggressively, that could entail a number of challenges. Third, the materials from previous litigation persuaded the Justice Department that adoption of single-member districts was imperative.
The City also argues, in testimony from both Robert Collie and Fred Hofheinz, that Plaintiffs acted politically and not as litigants in dealing with the Department of Justice. (Tr. vol. 10, p. 116 (Collie); Tr. vol. 8, p. 116 (Hofheinz)) Admittedly, it is difficult at some times to differentiate between the role being played by the persons who were politicians and who were also the litigants. The question is whether the Court can separate the Plaintiffs' roles as political figures, which some of the Plaintiffs undeniably were, and Plaintiffs' roles as litigants. The Court must answer that question in the negative, because the Plaintiffs' legal action was by nature intensely political.
The City argues in addition that Houston would have moved to single-member district election had not the Plaintiffs litigated the issue. The Court finds this argument to be spurious. The City offered at the hearing in support of this assertion the testimony of two former Mayors, Mr. Hofheinz and Mr. McConn, and one City Councilman, Mr. Robinson. These three men said that they supported the adoption of single-member districts for the Houston City Council. (Tr. vol. 8, pp. 94-95 (Hofheinz); Tr. vol. 9, p. 160 (McConn); Tr. vol. 8, p. 148) (Robinson)) However, the City Council never acted in accordance with the wishes of those politically powerful persons. Indeed, former Mayor Hofheinz testified that he tried several times to persuade the City to adopt single-member districts, even to the point of drawing plans for single-member districts. Hofheinz's efforts were to no avail. (Tr. vol. 8, p. 122-23) Hofheinz admitted in testimony that he did not have a majority to get a single-member district plan passed by the Houston City Council. (Tr. vol. 8, p. 130) In fact, Councilman Judson Robinson testified that the Council never even formally discussed adopting a single-member district plan while Mr. Robinson sat on that Council. (Tr. vol. 8, p. 154) Moreover, as the Court has noted previously, other efforts such as the straw vote and a legislative action to move the City to adopt single-member districts had proved unavailing. (Tr. vol. 8, pp. 150-51) Litigation, therefore was, as one of Plaintiffs' attorneys, Mr. Craig Washington explained, strategically the only way to achieve the adoption of single-member districts in Houston. (Tr. vol. 3, pp. 21-25) And the litigation team was specifically requested by the Plaintiffs to work with the Justice Department while at the same time pursuing this effort in litigation. (Tr. vol. 2, p. 179)
Houston finally argues that the presence of the Justice Department in 78-2174 obviated the need for Plaintiffs' counsel, and that, therefore, those counsel should not be compensated. The Court finds this argument to be incorrect. As Defendant recognizes, fees are awarded to parties who represent otherwise unrepresented interests in a lawsuit. For example, if the Justice Department adequately represents an intervenor's interests in a declaratory judgment *558 suit under  5, the intervenor may not receive attorney's fees. Yet, such is not the case before the Court. No evidence in the record indicates that the Justice Department pursued a course of action that represented Plaintiffs' interests. Indeed, the Justice Department as intervenor was obligated only to fulfill that responsibility and was not representing the Plaintiffs. The Court is persuaded that Plaintiffs performed all the essential tasks in the litigation at bar and then were joined at the eleventh hour by the Department. That late entry did not signal that the "cavalry" had arrived and Plaintiffs could relax. Every indication is that Plaintiffs made their own case even after the Department of Justice arrived, and that the Department did not actively represent the Plaintiffs.
In sum, the Court finds little credibility in the reasons other than the Plaintiffs' litigation that the City gave for the adoption of single-member districts. Former City Attorney Jonathan Day, Fred Hofheinz, and Judson Robinson all testified that the Department of Justice's actions caused the City to adopt the single-member district plan, (Tr. vol. 8, p. 88 (Day); Tr. vol. 8, p. 116 (Hofheinz); Tr. vol. 8, p. 172 (Robinson)) but each missed the real point: that is, that it was the actions of the Plaintiffs in litigating the matter that brought the Department of Justice to the point where it could pressure the City.

III. The Plaintiffs' litigation was a substantial catalyst for the City's changes in the method of electing City Council persons.
The Court considers for four reasons that Plaintiffs have proved that their litigation was the catalyst that moved the Department of Justice to press the City for adoption of single-member districts. The Court will discuss each of these reasons separately.
The first of these reasons concerns the public and single-member districts. The cases helped educate the public, which ultimately had to approve any City charter change to adopt a single-member district plan. As both former Mayors Hofheinz and McConn testified, the public until the late seventies was basically unaware of the dilemma in which minorities were placed because of the at-large election of City Council members. (Tr. vol. 8, p. 129 (Hofheinz); Tr. vol. 9, p. 187 (McConn)) The actions of the Plaintiffs in bringing their cases opened the public's eyes to the problems which minority candidates faced. Further, the issue of single-member districts was politically sensitive in Houston, as Mayor Hofheinz testified. Consequently, it was expedient for Houston's political hierarchy to allow the Plaintiffs to provide the impetus for single-member districts, rather than having to take the political heat themselves. (Tr. vol. 8, p. 121) Finally, the issue of single-member districts was of great interest in many localities during the relevant time period. (Tr. vol. 8, p. 118; Tr. vol. 9, p. 185) However, it took the Plaintiffs to bring about some sort of change. The City administrators, although they have subsequently professed to have favored single-member districts, were unable to bring about change by themselves.
The second set of reasons which persuade the Court that an award of attorneys' fees is appropriate concerns the actions of the City of Houston itself. For example, contrary to other representations made in testimony, former City Attorney Collie stated that he felt that the Plaintiffs would keep on filing law suits until the City adopted single-member districts. (Tr. vol. 10, p. 108) This persistence in prosecuting expensive law suits can only have moved the City to accede to the Plaintiffs' wishes. In addition, the City itself kept the records of the three cases and much of the material given to the Department of Justice together; in other words, the City recognized the commonality of the cases and the work that went to the Department of Justice. (Tr. vol. 7, p. 56) Moreover, when the Department of Justice asked the City for supplemental information in support of the submission, the Department of Justice received materials from 73-1650, such as the study done by Dr. McManus of the University of Houston (Tr. vol. 10, pp. 48-49), *559 and the appellate briefs in 73-1650, (Tr. vol. 10, pp. 57-58), and material regarding 78-2174. (Tr. vol. 7, p. 193); Defendants' Exh. 2 Finally, even officials who testified for the City in the hearing before the Court stated that they felt that they regarded themselves as being in an adversary relationship with the Plaintiffs at the time that the City met with the Department of Justice regarding the submission. For example, former Mayor McConn stated that he felt that he and his fellow officials were competing parties with the Plaintiffs when the parties went to the Department of Justice. (Tr. vol. 9, p. 171) And Jonathan Day, former City Attorney, stated that they asked that the material in the submission be kept confidential because of the City's position as a Defendant in the 73-1650. (Tr. vol. 8, pp. 76-77) Mr. Day objected on the ground that the material was "work product." "Work product" is by definition material prepared in anticipation of litigation, which leads the Court to conclude that the City certainly anticipated further litigation on the subject. See C. Wright and A. Miller, FEDERAL PRACTICE and PROCEDURE: CIVIL,  2021 (1970) (defining "work product").
Third, actions of the Plaintiffs' lawyers also supports the Court's holding. For example, those persons who were enlisted by the Plaintiffs' counsels to go to Washington to petition the Department of Justice on behalf of the minority community were persons who were already heavily involved in the litigation at bar. (Tr. vol. 7, p. 63) In addition, the lawyers for the Plaintiffs testified that they considered themselves when before the Department of Justice to be acting as competing parties in an adversary process; in the lawyers' estimation, the lawyers were there representing their clients, the Plaintiffs. (Tr. vol. 5, pp. 46-47 (Greene); Tr. vol. 7, p. 173 (Korbel))
Fourth, and most important, the actions of the Department of Justice clearly indicate that, but for Plaintiffs' litigation, the Department would not have taken action against the City. The importance of the litigation is evident from many circumstances. For example, the Department of Justice closed the meeting with City officials to the Plaintiffs because the Plaintiffs and the City were engaged in an adversary process over the issues that were being discussed with the City. (Tr. vol. 7, pp. 114-15) In addition, despite protest from Mr. Collie to the contrary (Tr. vol. 9, pp. 238-39), there are many indications that the cases against the City over single-member districts were discussed at length during the City's meeting with the Department of Justice. (Tr. vol. 7, pp. 72-78, 115) Moreover, there would have been an election were it not for the injunction that was issued in the Plaintiffs' case, 78-2174. (Tr. vol. 5, p. 123)
The most significant contemporaneous sign of how the litigation caused the actions of the Department of Justice to object is the Department's obvious and heavy reliance on the information Plaintiffs gathered for their lawsuits. (Tr. vol. 10, pp. 58-59) A letter dated June 11, 1979, from the Department indicates that the Department of Justice used this information. (Tr. vol. 9, p. 243) Furthermore, the circumstances surrounding the Department of Justice's objection clearly point to their heavy reliance upon the Plaintiffs' information.
The Department of Justice used some of the information that was obtained by the Plaintiffs in litigation before the Department's objection was made. Some of the information was used in regard to the amicus brief filed by the Department of Justice in 73-1650, on appeal with the Fifth Circuit. For example, Al Greene testified that he went over the exhibits in 73-1650 with Miriam Eisenstein, the lawyer for the Department of Justice who was drafting that brief. (Tr. vol. 5, pp. 52-53) Ms. Eisenstein appeared to have only the information from 73-1650 and no information from the Department of Justice regarding that case. (Tr. vol. 4, pp. 142-43) That indicates to the Court that the Department had little information of its own on Houston.
*560 From the outset, Al Greene and other Plaintiffs' attorneys put a great deal of effort into keeping the Department of Justice apprised of the situation. Mr. Greene wrote the Department of Justice, asking them to enforce the Voting Rights Act in Houston before filing 78-2174. (Tr. vol. 8, pp. 51-52) After the case commenced, the Plaintiffs still kept in contact with the Department of Justice. Mr. Greene, for instance, followed up on information he had begun sending the Department in 1976 by sending Dr. Davidson's book (Tr. vol. 4, pp. 170-71) without directly making overtures to the Department to take any particular action in Houston. Mr. Greene also told the Department of Justice about the imminent City election in July, 1979. (Tr. vol. 5, pp. 122-23) Numerous meetings and telephone conversations were had between the Department of Justice and Plaintiffs all the way through the process (Tr. vol. 7, p. 116), as well as five comments from Plaintiffs or Plaintiffs' representatives being filed during the relevant period. (Tr. vol. 7, p. 98) The lack of knowledge of the Department of Justice was abundantly clear to the Plaintiffs, and therefore they made every effort to see that the Department got the full facts. (Tr. vol. 7, p. 198) Most of those facts came directly from Plaintiffs' litigation.
The Department of Justice was given the full record in 73-1650 by the Plaintiffs, not just the excerpts the City had sent. (Tr. vol. 7, p. 194)[24] Two parts of the record proved critical in the Department of Justice's inquiry. One key element was the Plaintiffs' development of proof of racially-polarized voting from the cases that the Plaintiffs prosecuted. This was critical to the Department in determining that an objection was warranted. (Tr. vol. 8, pp. 7-8) Racially-polarized voting, as Robert Collie stated from the stand, is a necessary component of the Department of Justice's analysis. (Tr. vol. 10, p. 106) In order to determine whether racially-polarized voting exists, one has to trace various sociological factors. Those factors include the identification of the ethnicity of precincts, made difficult by changes in the precincts' ethnicity and lack of data; an analysis of various races, including finding the race of candidates and the voting returns for each precinct, again hard to find in Houston because of lack of accurate data and poor record-keeping; computation of the findings; and creating an array that would make those findings meaningful. (Tr. vol. 3, pp. 160-71) The Plaintiffs prepared one such extensive study in 73-1650. It took them months to complete this effort. (Tr. vol. 3, p. 166) Undoubtedly, it would have taken the Department of Justice a similarly long, if not longer, time to perform the same tasks, given the lack of manpower and lack of familiarity with the area. The Plaintiffs' expert, Mr. Garza, stated that in his opinion the Department of Justice could not have done the studies that were necessary without prior records and that the Department of Justice only had sixty days in which to compile its information. (Tr. vol. 1, pp. 108-09) By way of comparison, the Court was apprised that studies by MALDEF regarding Bexar County hispanics, some 830,000 people, took a staff of five persons working full-time much longer than sixty days to compile. (Tr. vol. 6, p. 80) Using the Plaintiffs' figures, the Department of Justice found, contrary to the assertions of the City of Houston, that there was racially-polarized voting in the *561 City; in fact, the Department found that there was severely racially-polarized voting in Houston. (Tr. vol. 3, pp. 169-71; Tr. vol. 10, p. 52) Based in part on this finding of racially-polarized voting, the City of Houston's annexation of predominantly white areas was determined by the Department of Justice to violate the voting rights of minority citizens of Houston. (Tr. vol. 7, p. 197)
The other significant identifiable contribution of the Plaintiffs' materials to the Department of Justice's efforts were the contributions of the witnesses which the Plaintiffs identified for the Department of Justice. Primary among those was the work of Dr. Chandler Davidson, a professor at Rice University and expert in demographics and voting rights. Dr. Davidson who, had testified for the Plaintiffs in the hearing before the three-judge panel in 1978, helped compile valuable information on racially-polarized voting. (Tr. vol. 4, pp. 56-57)
Dr. Davidson's background in racially-polarized voting studies, such as the work he did for his book Biracial Politics, was essential to Plaintiffs' cases and, later, in the analysis of the Justice Department.[25] Dr. Davidson testified that he had numerous contacts with the Department of Justice personnel. For example, he discussed racially-polarized voting in Houston with Assistant Attorney General for Civil Rights, Drew Days; he also talked with David Hunter, Gerald Jones and Ms. Eisenstein, all of whom were working on the submission from the City of Houston at the Justice Department. (Tr. vol. 4, pp. 30-44) Indeed, at the request of the Department of Justice, Dr. Davidson submitted a comment on the electoral analysis prepared by Dr. Susan McManus which the City tendered in support of its submission. (Tr. vol. 7, p. 98; Tr. vol. 4, pp. 33-34) The basis for his comment was the work he performed for Plaintiffs for admission as exhibits and/or testimony in their litigation challenging the at-large system of City Council elections.
Defendant advanced an argument that should be discussed here. The City contends that 75-1731 and 78-2174 were brought under  5 and that under  5, courts may not order changes in electoral practices. Counsel for Plaintiffs would seemingly agree. See testimony of George Korbel (Tr. vol. 6, p. 66):
If they make a determination the change is required to be precleared, then the only power that the three-judge court in the jurisdiction, the local jurisdiction, has is to enjoin the activity until the Department of Justice has had an opportunity to consider clearance and actually give clearance or until the jurisdiction has filed a lawsuit in the District of Columbia and received a declaratory judgment action; and that also requires a three-judge court.
However, that does not change the Court's conclusion that the Plaintiffs were prevailing parties. First, the complaints in both cases also alleged causes of action under the Constitution, which could easily be construed as requesting relief that includes the imposition of election by single-member districts. Moreover, the fact that the Justice Department mooted the claim by forcing the City to adopt single-member districts does not vitiate Plaintiffs' lawyers' claims, given the contributions those lawyers made to the Department's decision-making process. In addition, even if one only considers the  5 claims, the fact remains that Plaintiffs got what they prayed for, single-member districts, despite the fact that the Court could not order adoption of those districts under  5. If, in another context, a plaintiff's lawyer brought a suit on one ground, prayed for relief on it and then, on another, unstated ground, got all the relief that he requested, the lawyer presumably would receive an award on the basis of whatever his client received and not on what he stated as a *562 basis for relief. The Court also notes that Mr. Garza testified that until 1975, the question of whether substantive as well as injunctive relief was available under  5 remained open. (Tr. vol. 1, pp. 81-82) Finally, meriting attention as well is the fact that the Plaintiffs were heavily involved in drawing the actual plan that went to the voters. (Tr. vol. 9, p. 226) Clearly Plaintiffs and Plaintiff's witnesses such as Ben Reyes, Dr. Davidson, and Dr. Richard Murray discussed the drawing of plans with the Department of Justice (Tr. vol. 6, p. 31), as did Al Greene. (Tr. vol. 6, pp. 17-18) Much of the concern appeared to center about the use of outdated data by the City in drawing up the plans. (Tr. vol. 4, pp. 43-45) While the contents of many of the conversations are not available to the Court, many notations made during the meeting indicate that reference was often made to the Plaintiffs in discussions between the City of Houston and the Department of Justice. (Tr. vol. 7, p. 117)
The City's representatives also met several times with Plaintiffs and Plaintiffs' counsel. The City offered testimony to the effect that these meetings were merely normal meetings with constituents (Tr. vol. 9, p. 212; Tr. vol. 10, p. 119) like the public and private meetings of the nature had with many other persons who were not affiliated with the lawsuits (Tr. vol. 6, pp. 36-37) or that they were meetings encouraged by the Department of Justice to be had with all community leaders (Tr. vol. 10, p. 109). The City's witnesses also contended that the meetings were in any event, unspecific and not about particular plans. Tr. vol. 10, p. 111) Undeniably, however, many meetings were had with Plaintiffs, for example, with Ben Reyes and Mickey Leland (Tr. vol. 9, p. 210), with E.M. Knight and members of the GHCCO (Tr. vol. 9, pp. 211-12) and between Reyes and the City's expert who was drawing up the plan. (Tr. vol. 7, p. 121) That those meetings were more important than meetings had with other persons is evidenced by the fact that the meetings greatly affected the plan that the City ultimately submitted to its voters. Many plans were suggested or were in fact scrutinized during the period. (Tr. vol. 3, p. 136) However, evidence in the records indicates that several suggestions made by the Plaintiffs were adopted and incorporated into the final plan. For example, the escalator clause, which allows for expansion of the City Council and the number of districts as the City grows, is directly attributable to the influence of the Plaintiffs (Tr. vol. 7, pp. 119-20); in addition, the City made concessions to Plaintiff Ben Reyes regarding the drawing of lines for different districts. (Tr. vol. 9, p. 169)
Related to this argument is the City's contention that the Plaintiffs did not prevail because they wanted all City Council members to be elected from single-member districts, and what they ended up with was a mixed system of single-member and at-large elections. This argument is without merit for two reasons. First, the Plaintiffs certainly gained tremendously from what they received in the mixed system, as now a majority of City Council members run for election in single-member districts, and minorities gained seats on the Council. Before institution of election by single-member districts, several minority candidates had run for city office and, while winning the minority vote, lost city-wide. (Testimony of Dr. Davidson in 73-1650, vol. V at 22-25) Before single-member district election, only one black and no hispanics had been elected to the City Council; now four minorities (three blacks and one hispanic) sit on it. (Tr. vol. 7, p. 128) Given that the black and hispanic population of Houston alone would make it the fourth largest city in Texas, the achievement is significant. (Tr. vol. 7, p. 126) According to the 1970 census, Houston was 26% black and 12% hispanic, for a total of at least 585,000 minority citizens. In fact, the number of City Council members was increased to allow for the new office-holders from single-member districts, which arguably increased the impact of the new system in favor of minorities. It is well established that Plaintiffs need not obtain all relief they have requested in order to be prevailing parties. Marion v. Barrier, 694 F.2d 229, *563 231 n. 1 (11th Cir.1982) (per curiam), citing Knighton v. Watkins, 616 F.2d 795, 799 (5th Cir.1980).
In sum, the Court finds it clear that the Plaintiffs' litigation was absolutely critical to the Department of Justice in the Department's determination to object to the City of Houston's submission. Without the information and aid of the Plaintiffs, the public and the Department would not have been willing to go forward with the type of reform that was ultimately made. The Court cannot separate the Plaintiffs' functions as political figures and litigants. The two roles are inextricably intertwined, and the Court sees no reason to deny attorneys' fees to a lawyer who worked long and hard on extremely difficult and emotion-charged issues simply because some of their clients had political affiliations and offices. What is important is that although some of the Plaintiffs were political figures, as litigants they are entitled to have their attorneys' paid if they are the prevailing party which they clearly were. And the Court considers the work done for litigation that is used in another forum, the action of which moots the litigation compensable. See discussion supra of Webb and Gerena-Valentin; see also Sullivan v. Commonwealth of Pennsylvania Department of Labor and Industry, Bureau of Vocational Rehabilitation, 663 F.2d 443, 445 (3rd Cir. 1981) (attorney's fees awarded to counsel whose efforts in prosecuting Plaintiffs' Title VII suit "were a material factor" in Plaintiffs' obtaining the relief sought in arbitration). Defendants assertion that Plaintiffs' actions had to lead "inexorably" to the Justice Department's actions is incorrect. What else might have happened is irrelevant. The point is that the Plaintiffs' lawyers' actions did lead to the Department's decision. Criterion Club of Albany v. Board of Commissioners of Dougherty County, Georgia, 594 F.2d 118, 120 (5th Cir.1979) (per curiam) supports the Court's conclusion. In Criterion Club,
the plaintiffs brought a class action on behalf of the black residents of Dougherty County, Georgia, against that county's Board of Commissioners, alleging that the county-wide, at-large system of electing the Board abridged their fourteenth and fifteenth amendment rights. The case never proceeded to trial. Instead, the parties reached an agreement pursuant to which the Dougherty County legislative delegation introduced a bill in the Georgia General Assembly redistricting the county and providing the opportunity for the election of at least two blacks to the County Commission. The bill passed and was signed by the Governor. The district court denied the plaintiffs' application for section 1988 attorneys' fees. The Fifth Circuit remanded the case to the district court with the direction that if the district court found that the legislative changes that occurred were a consequence of the filing of the plaintiffs' suit by way of a compromise or other agreement of the parties, then attorneys' fees should be awarded.
Sullivan, 663 F.2d at 449. Presenting the bill to the General Assembly did not "inexorably" lead to passage of the bill, as the Assembly could have voted the legislation down. Yet, once the Assembly passed the bill, attorneys' fees were available for prosecuting the case that caused the bill to go to the Assembly. See also Hardy v. Porter, 613 F.2d 112, 114 (5th Cir.1980) (lawyers should be compensated for work done on unsuccessful issue in litigation when work aids in prosecution of successful claim).

IV. The Amount of the Attorneys' Fee Award
Having determined that the Plaintiffs' lawyers are entitled to an award of fees, the Court must decide how much compensation each lawyer should receive. As indicated in the discussion of the law above, the Court considers that it first must examine the Johnson factors and then decide whether a multiplier should be used. The Court therefore turns to the Johnson factors. Initially, the Court will discuss the factors applicable to the case generally, such as the general level of the skill required to prosecute the action and the novelty *564 of the issues presented. Then the Court will apply the factors that relate to each individual attorney, e.g., his particular qualifications, his professional hardship in taking the case, and the reasonableness of the numbers he spent on his tasks in the litigation.
Several Johnson factors concern the case itself. The first factor to which the Court turns is the general level of skill of the attorneys involved.[26] The Court is convinced that a high level of skill was necessary in the litigation under consideration. For example, 73-1650 required a tremendous amount of work and skill to put together a constitutional challenge based on massive amounts of raw data compiled into statistics. And the litigation under the Voting Rights Act also was very complex. Normally, as explained above, litigation under Section 5 is not overly complex. But in the case at bar, the newness of the extension of the Voting Rights Act to Texas and the dearth of attorney information and knowledge regarding extension of the statute complicated the case. (Tr. vol. 5, pp. 3-4) The Court is persuaded from the testimony and a review of the record that the attorneys for the Plaintiffs were quite skillful. The lawyers made a good showing on a bare budget in an extremely difficult case, and the Court is convinced that the quality of representation was quite high. (Tr. vol. 7, pp. 140-41) The Court considers in particular that Mr. Korbel's and Mr. Botello's knowledge of the Voting Rights Act and ability to locate expert witnesses was outstanding. (Tr. vol. 3, p. 89; Tr. vol. 5, pp. 7-8) In addition, the exhibits that were put together for 73-1650 showed a high degree of skill and professionalism. (Tr. vol. 5, pp. 4-7)
Another factor which the Court must take into account under Johnson is the speculative nature of the case, and the cases at bar were indeed speculative. Initially, the cases were speculative from a legal point of view because the litigation's outcome was so uncertain; in other words, given the resources available to the Plaintiffs relative to the resources available to the other side, plus the novelty of many of the questions presented, see infra, the cases can at best be called highly speculative. Then too, the cases were speculative in nature because, as Mr. Dippel pointed out, there was no fixed fee involved for the attorneys. Thus, the cases were speculative from a professional nature because the lawyers who represented the Plaintiffs were unsure whether they would be paid (Tr. vol. 1, pp. 129-30) and, if they were paid, they had no set hourly rate for which they had contracted.
Results obtained also justify an award of attorneys' fees. As Mr. Dippel stated in testimony, the main value of litigation is getting for the client what the client wants. (Tr. vol. 2, p. 53) Although initially disappointed by the outcome of the trial of 73-1650, (Tr. vol. 2, p. 127), the Plaintiffs ultimately were satisfied because Houston adopted single-member district election of City Council members. (Tr. vol. 5, p. 19) Houston's large size and prior unwillingness to change to single-member district elections especially made this change an important accomplishment. (Plaintiffs' Exh. 50)
Efficiency also was a hallmark of Plaintiffs' preparation of their case. The City admits that the average time claimed to have been expended is not unreasonable. Its witness, Mr. Cooper testified that the time record for the preparation and prosecution of the case does not appear to be unreasonable. (Tr. vol. 9, p. 67) As Mr. Cooper pointed out, expertise in a particular type of litigation will increase the efficiency of the pursuit of that litigation. (Tr. vol. 9, pp. 120-21) The Court is persuaded that the expertise of the Plaintiffs' attorneys had that effect in the cases at bar. For example, when there were only a few attorneys working on the case, and those attorneys realized that the case had grown *565 too large for them to handle, they called in other attorneys; however, they called in only a small task force to allow them to do their work efficiently and without duplication. (Tr. vol. 4, pp. 173-80) Another example of the efficiency that Plaintiffs' attorneys manifested was to use informal discovery in 73-1650, substantially reducing the cost to themselves and the City (and ultimately the taxpayers) of undertaking a massive case. (Tr. vol. 8, p. 8) In addition, the Court has examined the various fee petitions submitted and determined that the Plaintiffs spent minimal hours on their briefing and made good efforts to efficiently distribute their time among the various tasks needed. (Tr. vol. 3. pp. 38-41) Finally, the Plaintiffs' attorneys used their expert witnesses prudently. The use of Dr. Charles Cottrell of San Antonio provides a good illustration. Dr. Cottrell was going to testify for the Plaintiffs, but the Plaintiffs' attorneys decided shortly before trial that Dr. Cottrell would not be needed. Instead of asking Dr. Cottrell to stay just in case he was needed, the attorneys sent him home. (Tr. vol. 7, pp. 141-42) Another factor justifying an award of attorneys' fees in the instant case is the lack of duplication which is manifested in these cases. As one witness, Mr. Dippel noted, there is no discernible duplication of efforts among the attorneys present in the record. (Tr. vol. 2, pp. 72-73) As Plaintiffs' attorneys emphasized, they had no incentive to duplicate efforts; in fact, the large amount of work to be done by relatively few people made it imperative that all tasks be split up and performed as efficiently as possible. (Tr. vol. 3, pp. 14-15; Tr. vol. 7, p. 139) The lawyers avoided duplication by spliting up tasks daily (Tr. vol. 7, p. 139) at meetings held in Mr. Greene's office. At these meetings, the attorneys discussed the case, apprised each other of what they had done, and apportioned the tasks among themselves. (Tr. vol. 3, p. 14) Examples of the lack of duplication in the case proliferate in the record, four sufficing to prove the Court's point. First, the attorneys in some sense divided the clientele among themselves in order to work more efficiently with them. For example, Mr. Washington and Mr. Greene particularly focused on the black Plaintiffs and the black interests in the case. The other attorneys spent more time with the hispanics and involved in the hispanic questions. (Tr. vol. 2, p. 109) Although these divisions were not rigid, they did allow for division of authority and responsibility among the lawyers; also, they allowed the varying interests of different ethnic groups to be most fully represented. (Tr. vol. 7, pp. 148-49) A second example is how witnesses were found and prepared. One of the Plaintiffs, Ben Reyes, helped track down expert witnesses to be examined for possible use at trial. Mr. Reyes and Mr. Botello would then perform intermediate tasks such as initially interviewing the experts and arranging for studies. George Korbel would finally conduct a second interview with witnesses that might be used and then decide if the witnesses would indeed be asked to testify. (Tr. vol. 7, pp. 139-40) Third, the lack of duplication was further manifested in the briefing process. For example, for the initial appellate brief, Mr. Greene procured the record and outlined the record. Mr. Korbel, taking that outline, went through the transcript and drafted the brief. The brief was then subjected to the scrutiny of the other attorneys. (Tr. vol. 8. pp. 3-4) For the reply brief, a similar process was used. Mr. Korbel prepared the first draft, and Mr. Greene revised it. (Tr. vol. 5, pp. 103-05) Fourth, Plaintiffs' lawyers avoided duplicate efforts at trial. Examples of this lack of duplication are that attorneys cross-examined the persons for whom they considered this would be the most effective.[27]See Mr. Washington's examination of Judson *566 Robinson, discussed supra and the use of different lawyers to cross-examine and brief witnesses during trial. (Tr. vol. 3, p. 57).
The final factor which the Court finds relevant to the case under Johnson is the novelty and difficulty of that case. The Court has examined seven circumstances that made the questions in the case before the Court particularly novel and difficult from the Plaintiffs' attorneys' standpoint.
Often, the quality of the Defendants' lawyers' work was quite high, requiring significant efforts from the Plaintiffs' attorneys' to meet the challenge, which they did. (Tr. vol. 3, pp. 16-17. In addition, the time pressures on the Plaintiffs' attorneys' were great. As Mr. Greene explained, some of the time pressures were caused by circumstances alone. Plaintiffs wanted relief as soon as possible, and frequently made this abundantly clear to their attorneys; often the Plaintiffs' attorneys received very short notice on settings; and, in 75-1731 and 78-2174, the issues involved had to be resolved before the elections involved occurred. (Tr. vol. 5-17) Another time factor was that the City would often delay in giving its submissions to the Department of Justice, and then send in massive amounts of information and request expedited consideration of their submissions. Consequently, the Plaintiffs had little time to consider and respond to the submissions. (Tr. vol. 5, p. 49) Still another factor increasing the difficulty of the cases at bar for Plaintiffs' attorneys was the slim budget on which the cases were prosecuted. Mr. Korbel noted during the hearing that the litigation budget had "the least" funds of any budget in any litigation in which he had been involved. (Tr. vol. 7, p. 170) And, examining the record, the Court agrees that the Plaintiffs' resources were slim both in terms of manpower and money. Admittedly, some organizations and individuals gave money for the prosecution of this case. For example, a small contribution came from Lawrence Pope (Tr. vol. 4, p. 164), and there was some help from the N.A.A.C.P. Legal Defense and Educational Fund, Inc. (Tr. vol. 3, p. 37) In addition, a single-member district defense fund raised two thousand dollars ($2,000) to three thousand dollars ($3,000) to pay for the record that was used in preparing the Fifth Circuit brief in 73-1650. (Tr. vol. 4, p. 164; Tr. vol. 7, p. 136) The Court also notes that one of the Plaintiffs, Ben Reyes, paid for Mr. Korbel's plane ticket to Washington when Mr. Korbel went to speak to the Department of Justice. (Tr. vol. 8, pp. 33-34) However, such isolated and limited contributions in no way covered the expense of this large case. No organization systematically funded this lawsuit (Tr. vol. 7, p. 136), principally because the resources of organizations normally appealed to in such cases were overextended. Id. For example, MALDEF could not fund 73-1650, as the organization was busy itself and had little to share with the Plaintiffs. (Tr. vol. 3, pp. 106-07) In sum, the expenses for the cases in large part came out of the pockets of the Plaintiffs' lawyers. One graphic illustration is that Mr. Korbel and Mr. Greene paid the expenses of Dr. Charles Cottrell and one of the other expert witnesses out of their pockets when no other money could be found. (Tr. vol. 8, pp. 6-7)
Difficulty also arose for the Plaintiff's lawyers because of the cases' racial overtones, and the City Attorney who led the City's defense at the trial of 73-1650 and who later oversaw the briefing in the appellate court was a black person, Otis King. (Tr. vol. 3, p. 18; Tr. vol. 8, p. 57) Complications also arose because of the racial nature of the case when the City moved to recuse this Court from hearing the attorneys' fees matter because of the Court's alleged membership in the class in one of the cases; the recusal motion made the case lengthier and more difficult for the Plaintiffs' attorneys. The Court is unpersuaded by the City's argument that hours Plaintiffs' lawyers spent on the recusal motion and the subsequent unsuccessful petition for writ of mandamus should go uncompensated. Maintaining the forum to which the case was originally assigned was crucial to avoid delay, (Tr. vol. 5, p. 19-20) *567 even the City's expert, Mr. Cooper, testified that he would have billed for hours spent opposing recusal. (Tr. vol. 9, p. 109-10)
The difficulty of the case can also be attributed in part to the novelty of many of its elements. (Tr. vol. 2, p. 77) The Court has pinpointed five issues the City raised which lengthened and complicated the litigation at bar. These issues are: whether a jurisdiction can be enjoined to submit to the Voting Rights Act (Tr. vol. 7, pp. 22-23); what constitutes an election (Tr. vol. 7, p. 23); whether the City was covered by the Voting Rights Act (Tr. vol. 7, p. 22); the parameters of the intent element under the Voting Rights Act (Tr. vol. 7, p. 21); and whether a city can flout, as Houston did, its promise to a three-judge panel to inform that panel of any upcoming election which might violate the Voting Rights Act (Tr. vol. 7, pp. 23-24).
The Court also finds justification for an award of fees in the sheer size of the cases. That size is manifested in four ways. First, the huge record, which does not even include all the material Plaintiffs collected in preparation for trial, illustrates graphically how enormous and difficult an undertaking the cases were. (Tr. vol. 7, p. 24) Moreover, the length of trial as compared to other similar types of cases reveals the nature and complexity of the cases at bar. Three days of trial, for instance, were needed to hear the Bexar County case under the Voting Rights Act; five and a half weeks of trial were necessary for 73-1650. (Tr. vol. 2, p. 162) That the City used 19 attorneys also indicates that the case was a large and complex one. (Tr. vol. 8, pp. 58-59) Finally, the numbers of experts used clearly shows that the case was one of no ordinary size. The City's witness, Mr. Collie, acknowledged that the case demanded expert testimony. (Tr. vol. 10, pp. 41-42) The extensive use of experts and of other persons with specialized knowledge is graphically illustrated by what the City spent on expert witnesses. The City of Houston spent over $255,000 in the cases at bar on expert witnesses (Plaintiffs' Exhibit 17) which was eighteen times higher than the amount of fees it had for expert witnesses in any other single litigation prior to the trial of 73-1650. (Tr. vol. 7, p. 133) And the City called on many of its own personnel to testify in their areas of expertise; all the City's department heads testified regarding the responsiveness of their departments to the minority community. (Tr. vol. 5, pp. 3-4) And, of course, the Plaintiffs' experts cannot be discounted. The Plaintiffs, with their lean budget and meager resources called 8 expert witnesses and utilized more in preparation for the case. (Tr. vol. 7, p. 25).
The secrecy with which the City of Houston cloaked many of its movements also complicated the case. One illustration of such secrecy has already been adverted to: the City requested that the Justice Department close the meeting between Houston officials and the Department in 1979. Closing such a meeting is unusual. (Tr. vol. 6, p. 78; Tr. vol. 7, p. 101) The closing of the meeting hindered the efforts of the Plaintiffs to find material which they needed. The City also lacked openness and candor in discovery. (Tr. vol. 9, p. 100) Cooperation can cut costs of discovery (Tr. vol. 9, p. 100), e.g., when one receives data from a public record instead of having to go through the subpoena or discovery process, expenses are shaved. (Tr. vol 1, p. 125) However, in several instances, the Plaintiffs were forced into protracted legal maneuvers in order to obtain materials they needed. For example, the City refused to tender voluntarily its equal employment opportunity data, and those records had to be subpoenaed. (Tr. vol. 4, pp. 90-91) More importantly, Mr. John Whittington, an Assistant City Attorney, had removed from the public records official election returns for the City of Houston. (Tr. vol. 7, pp. 24-25) The Plaintiffs wished to procure these figures in order to check the figures against the unofficial ones which their experts had been using, insuring the accuracy of the exhibits that the Plaintiffs would prepare. (Tr. vol. 8, p. 10) However, the City removed the records, and only an opinion from the Texas State Attorney General *568 under the Open Records Act of Texas gave the Plaintiffs access to that material. (Tr. vol. 4, pp. 176-81) The delay caused by the City's action meant that the Plaintiffs' attorneys only got the records a few weeks before trial, thereby increasing the time pressure. (Tr. vol. 4, p. 181) Such actions by the City of Houston are deplorable. Yet another instance in which the City obviously used a campaign of secrecy in regard to the Plaintiffs' attorneys concerned the submissions under the Voting Rights Act. When the Voting Rights Act was made applicable to Texas in 1975, Congress ordered that it be retroactive to 1972. In other words, the City of Houston had to file submissions regarding election changes between 1972 and 1976. (Tr. vol. 7, p. 30) The City prevailed upon the Department of Justice to refuse to tender copies of the public submissions to the Plaintiffs. This procedure is, Mr. Korbel testified, relatively unusual. (Tr. vol. 7, pp. 28-30) The Plaintiffs attempted to circumvent the Department and the City by subpoenaing those who had prepared the submissions, but those subpoenas were quashed. (Tr. vol. 7, pp. 31-32)
Finally, the City made the cases more difficult than they would have been otherwise by reneging on an attempted settlement during a hearing before this Court on June 18, 1984. At that hearing, the Court denied the City's Motion to Recuse. The City and the Plaintiffs' lawyers announced after the lunch recess that the parties had settled the question of fees. (Tr. of Proceedings of June 18, 1984 hearing, p. 2) However, the City abruptly rejected the proposed settlement after filing a mandamus action in the Fifth Circuit to force the Court to recuse itself. Apparently, Mr. Whittington never recommended settlement to the City Attorney, contrary to his promise in Court to do so. (Tr. Vol. 7, pp. 155-58) The City's own expert witness agreed one could criticize such actions. (Tr. vol. 9, pp. 102-06) It is the Court's opinion that the aborted settlement effort only protracted and complicated the case before the Court. In sum, the City's actions protracted and made more difficult the final resolution of this case. The Plaintiffs' attorneys are entitled to be paid for being subjected to this conduct. Unfortunately, it is the taxpayers who will have to pay the bill for these stalling tactics by the City Attorney's office and whoever issued the "marching orders."
Defendants contend that Mr. Korbel testified on matters going to the question of whether Plaintiffs were prevailing parties, and should therefore not be compensated for all the time he spent after the need for his testimony became apparent. Defendant cites State Bar Rules DR 5-102 in this regard. DR 5-102 mandates that when an attorney knows that he ought to be called as a witness in a case, he must cease to represent parties in that case unless the attorney is to testify on formal or uncontested matters or withdrawal would work a substantial hardship on the client. The Court disagrees for two reasons. First, the Court considers that DR 5-102 is not applicable, as Mr. Korbel's testimony only dealt with the attorneys' fees portion of the case. The merits of the case at bar have long been settled. The fact that only fees were in question makes a difference because Mr. Korbel testified at a time when he was in essence representing himself ÔÇö as attorneys normally do during fee request proceedings. Compare Rybicki v. State Board of Elections of the State of Illinois, 584 F.Supp. 849 (N.D.Ill.1984) (lawyers who first represented Plaintiffs and then testified on merits not entitled to fees for periods after lawyers knew they would have to testify). Moreover, even if DR 5-102 does apply, the Court considers that Mr. Korbel should be exempted from its strictness under exception two. To engage another attorney to represent the party currently in interest, Mr. Korbel himself, would be expensive, would delay the case, and would make unavailable to Mr. Korbel's new lawyer and his fellow lawyer the wealth of information and expertise someone involved in the entire litigation effort could bring to the issue.
Defendant also argues that Plaintiffs' lawyers should not be compensated at current *569 prevailing rates for all work performed. Defendant suggests that instead the Court should compensate the lawyers at rates appropriate for the times at which they performed the work for which they were being paid. The Court declines to follow this suggestion. First, the City provides no authority in support of its unusual proposal. Second, the City's plan would not compensate for the delay in payment Plaintiffs' lawyers have borne. "Attorneys should not be forced to discount their services by receiving payment that does not take into account the diminution in value caused by inflation or the time value of money." Comment at 802. Courts have used current rates to compensate for the use of money which delayed payment occasions. Copper Liquor, Inc. v. Adolph Coors Co., 684 F.2d 1087, 1096 n. 26 (5th Cir.1982). This case is clearly not one where the Plaintiffs' lawyers waited for the prevailing rate to rise before applying for attorneys' fees, which might justify not using the current prevailing rate. (See Tr. vol. 2, p. 98) The Court, therefore, finds no reason to deviate from the accepted practice of using current prevailing rates when assessing attorneys' fees. See, e.g., Murray v. Weinberger, 741 F.2d 1423, 1433 (D.C.Cir.1984); Graves v. Barnes, 700 F.2d at 224; Phillips v. Weeks, 586 F.Supp. 241, 245 (E.D.Ark.1984); Clarke v. Amerada Hess Corp., 500 F.Supp. 1067, 1075-76 (S.D.N.Y.1980).
Having examined the factors mandated by Johnson, the Court turns to the matter of the records submitted by the Plaintiffs' attorneys. The Court notes that generally the City lodged two objections to the time records submitted by the Plaintiffs' attorneys. First, the City's expert in the matter, Mr. Cooper, suggested that a daily basis is inappropriate for billing, and that instead an hourly or increment of an hour system should be used. (Tr. vol. 9, pp. 60-62) The Court remains unpersuaded by this argument for two reasons. First, as Mr. Botello pointed out, the case was too all-consuming for perfect time records to have been kept, and each of the attorneys was so involved in the case that he was not splitting his time with other matters. (Tr. vol. 2, p. 188) Mr. Cooper objected secondly to the lack of detail in many of the notations in the time records. (Tr. vol. 9, p. 123) Again, the Court is unpersuaded by this argument for three reasons. As Mr. Dippel testified, attorney's records often reflect little detail about tasks performed. (Tr. vol. 2, pp. 66-67) Moreover, as Mr. Cooper admitted, it is very possible to cheat oneself when reconstructing one's hours, from time spent, as many of Plaintiffs' counsel were forced to do. (Tr. vol. 9, p. 73) Finally, courts awarding attorneys' fees have accepted reconstructed time records as adequate proof of time spent on a case. City of Detroit v. Grinnell Corp., 560 F.2d 1093, 1102-03 (2d Cir.1977); Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 109 (3d Cir.1976); In re Ampicillin Antitrust Litigation, 81 F.R.D. 395, 402 (D.C.Cir.1978).
Having satisfied itself that the records themselves adequately reflect the tasks which the Plaintiffs' lawyers performed and the time those tasks took to perform, the Court turns to the elements of the different tasks which are found in the time records, and examine whether those records are properly included in charges for fees. As the City's expert, Mr. Cooper, testified, a lawyer's experience and ability decide in large part the rate which that lawyer charges. (Tr. vol. 9, p. 26) The Court recognizes that Mr. Cooper's expertise in the matter of attorneys' fees is limited, as he does not sit on any of the committees that set the fees for lawyers in the firm for which he works. (Tr. vol. 9, pp. 22-24). Firms' fees also do not always represent the time worth of the services. See Comment at 802 ("... the attorney's normal billing rate may be nothing more than a starting point from which non-contingent fees are determined according to the results of the work. The hourly rate may also serve internal accounting control purposes for the firm. So the hourly rate charge is not always an accurate reflection of the attorneys worth in the marketplace." *570 (footnote omitted)). C.f. Blum v. Stenson, 104 S.Ct. at 1547 n. 11 However, Mr. Cooper did outline four elements which are included in the time records which he said he would charge for, thereby supporting the Plaintiffs' claim for these fees. These elements are: 1) work in opposition to a recusal motion (Tr. vol. 9, p. 109); 2) work done during hearings on attorneys' fees (Tr. vol. 9, p. 99); 3) administrative hearings (Tr. vol. 9, p. 82); and 4) preparation of exhibits. (Tr. vol. 9, p. 112)[28] Other witnesses also testified that attorneys had billed the City equally for in-court and out-of-court time (Tr. vol. 7, p. 54), as did Plaintiffs' lawyers. Of course, an attorney who takes what he perceives to be too long on a project may well discount his or her time (Tr. vol. 2, pp. 67-68) and Mr. Cooper stated that he discounts his time if he had to wait for some time (Tr. vol. 9, p. 116). However, there is no suggestion as to that effect in the record.
Thus, the Court turns finally to the question of the reasonableness of the hours requested for the Plaintiffs' attorneys. The Court has carefully examined the requests and reviewed the record and determined that the requests are reasonable in terms of the amounts of efforts expended and the other factors outlined above. As Mr. Korbel noted in testimony, the attorneys' fees request is unusually large compared to awards in other Voting Rights Act cases, but many of the factors that have inflated the request have been beyond the control of the Plaintiffs' attorneys and were caused by the actions of the City and some of its attorneys. (Tr. vol. 7, p. 15) Also, the attorneys' testimony satisfies the Court that the lawyers used adequate billing judgment in instances too many to enumerate; some instances are detailed below. The Court has described above many of the reasons which it feels justify the award in the size requested. The Court would simply note two more things. First, the City's expenditures on the instant cases clearly indicate that the cases were of unusual magnitude and expense. For example, the City spent half a million dollars of staff time alone to prepare for the trial in 73-1650, not including the time spent by in-house counsel. (Tr. vol. 7, p. 57) In addition, the City spent over $250,000 for the cases in experts' fees. (Tr. vol. 7, p. 56) Second, Mr. Cooper's predictions of the correct rates and his declaration that the Court should discount the hours claimed by Plaintiffs' attorneys by ten to twenty percent due to duplication are incorrect.[29] Mr. Cooper's assessments were unhelpful in part because they were based simply on general principles, not any enumerated problems in the instant fee requests. (Tr. vol. 9, pp. 80-82); see National Association of Concerned Veterans v. Secretary of Defense, 675 F.2d 1319, 1329-30 (D.C. Cir.1982) (court need consider only specific objections to requests for attorneys' fees). And the Court finds Mr. Cooper's declarations to be of little weight because Mr. Cooper lacks familiarity with situations such as the one in the case at bar. Mr. Cooper never examined the record in 73-1650 (Tr. vol. 9, pp. 80-81), and has not been involved in trial of a single-member district case, a case in federal court that lasted more than one day, or in a case where the outcome determined whether the Plaintiffs' attorney would be paid. (Tr. vol. 9, pp. 70-71, 87) Mr. Cooper's experience is so different from that of the Plaintiffs' attorneys that Mr. Cooper's testimony is of little aid to the Court. (Tr. vol. 9, pp. 71-72)
The lead counsel in all the cases the Court has before it was Mr. Greene. (Tr. vol. 5, p. 52) Mr. Greene put together the teams and did much of the spadework for the litigation. Mr. Greene also did the trial notebook outline for the cases, (Tr. vol. 3, p. 13), and allowed his office to be used as command post and barracks for some members of the litigation. (Tr. vol. 5, p. 43) He *571 also wrote much of the reply brief. (Tr. vol. 8, p. 4) At the hearing on the instant motions, Mr. Greene presented Mr. Charles Dippel as a witness on his behalf. Mr. Dippel testified that Mr. Greene is a trial attorney with outstanding qualifications. Mr. Greene has been a member of the Texas bar since 1959, (Tr. vol. 4, p. 152) and was certified in 1978 by the Board of Law Examiners as an expert in civil trial law. He also teaches and has lectured and published. (Tr. vol. 1, pp. 117-18; Tr. vol. 5, pp. 108-09)
Undertaking the litigation at bar was a hard task for Mr. Greene, he experiencing many difficulties as a consequence of his employment as lead attorney. For example, Mr. Greene found the cases very hard to undertake as a sole practitioner. The case precluded all other employment during discovery and trial of 73-1650. Mr. Greene attempted to employ an associate during the relevant period of his flagging income, but the associate did not work out well. (Tr. vol. 5, pp. 41-42) Mr. Greene stated that he had virtually no income during the time the cases were a special constraint because he was devoting all his efforts to them. (Tr. vol. 5, p. 42) Mr. Greene had no professional relationship with the Plaintiffs prior to becoming involved in the litigation (Tr. vol. 5, p. 17), and the instant cases made his finding new clients more difficult than it would have been had he not undertaken the cases. Specifically, Mr. Greene stated that the community reacted negatively to his involvement in the litigation at bar; the cases' racial overtones made the cases undesirable professionally to him. (Tr. vol. 1, pp. 133-34) Mr. Greene described the dilemma he faced to the Court: he said that whites refused to employ him because he had black clients, and blacks did not come to him because he was not black. (Tr. vol. 5, pp. 40-41)
Mr. Greene's fee agreement in undertaking the cases was that if the Plaintiffs won in the cases, Mr. Greene would request fees from the City. (Tr. vol. 5, p. 16) In regard to a fee, Mr. Greene is requesting $250 an hour, which he asserts is the customary fee for work of this type in the area. (Tr. vol. 1, pp. 135-36; Tr. vol. 5, p. 16) Mr. Greene increased the request from $150 an hour to $250 an hour after finding that rates had increased in the Houston area for work of the type that he performed. (Tr. vol. 5, pp. 65-66) He has also requested a multiplier of two. The Court considers that $200 per hour is a proper rate for Mr. Greene.[30]
The number of hours Mr. Greene has requested compensation for is reasonable. The Court has examined the fee request from Mr. Greene in light of the work he performed and the difficulty of the case, and agrees with Mr. Dippel that Mr. Greene's time was not excessively stated. (See Tr. vol. 8, pp. 4-5) Mr. Greene now keeps his time by putting the time notations on slips, which are transferred into a machine. (Tr. vol. 5, pp. 68-71) Mr. Greene bills a minimum of three-tenths of an hour for each task he performs. The Court finds this practice to be reasonable because Mr. Greene compensates by exercising billing judgment. In some instances, however, discretion as to whether to bill in days and not in specific hours is undesirable. The Court also notices that some of Mr. Greene's references are unspecific.[31] (Tr. vol. 9, pp. 65-66) However, the Court remains unpersuaded that the City has demonstrated that Mr. Greene's hours were excessive.
*572 Mr. George Korbel also was a leading attorney in the cases before the Court. Mr. Korbel's work in trial and before the Department of Justice were invaluable. Mr. Korbel, who has been licensed to practice law since 1968 (Tr. vol. 6, p. 42), had to spend the first three weeks of his participation reading and doing background research on the situation in Houston (Tr. vol. 7, pp. 165-66); but, once he was acquainted with the situation, he moved swiftly into the arena. In preparation for trial, Mr. Korbel provided critical help regarding the requisites of proving the disproportionate voting strength that at-large election of City Council members gave the majority community. Similarly, later on, Mr. Korbel gave invaluable aid regarding the legislative history of the Voting Rights Act, as Mr. Korbel is an expert in the area. Mr. Korbel's understanding of the Act was unique. At the time, only a few lawyers were experts in the area of voting rights. At the time of trial, the shortage was particularly acute in Texas, which only became subject to the Voting Rights Act in 1975. (Tr. vol. 4, pp. 162-63) At trial, Mr. Korbel was responsible for questioning witnesses he had helped locate and prepare, and did much of the briefing. Still later, Mr. Korbel dealt closely with the Department of Justice in negotiations regarding single-member districts. (Tr. vol. 7, p. 112) Ultimately, he helped draw the districts. (Tr. vol. 3, p. 137)
Mr. Korbel's professional experience eminently qualified him for the instant cases. He has much experience with class action litigation on voting rights, and has also prepared scholarly work and belonged to organizations concerned with that field. (Tr. vol. 6, pp. 50-58) As Al Greene stated, he called in George Korbel not only because 73-1650 was not a one-lawyer case, but also since Mr. Korbel's expertise in the field of voting rights made him an invaluable addition to the litigation team. (Tr. vol. 5, p. 103) Furthermore, Mr. Korbel's experience with the Department of Justice made him an important part of the team that dealt with the Department in the later stages of obtaining single-member districts. (Tr. vol. 6, p. 72)
Mr. Korbel suffered professional hardship because of his undertaking the cases at bar. Although Mr. Korbel had represented Ben Reyes, one of the Plaintiffs, since 1971 in various civil rights litigation, the fee arrangement in the instant cases was such that Mr. Korbel was not recompensed for his work. Instead, as did Mr. Greene, Mr. Korbel agreed to take only money that would come from Defendants after victory at trial. (Tr. vol. 3, p. 89; Tr. vol. 7, pp. 123-24) The cases also precluded other employment for Mr. Korbel during the relevant period. For example, the City of Lubbock was also litigating single-member districts at the relevant time. Mr. Korbel was asked to participate in that case, but declined because of his duties in the Houston case. The Plaintiffs' lawyers in the Lubbock case ultimately were awarded fees for their efforts. (Tr. vol. 7, pp. 134-35) Moreover, Mr. Korbel was asked to represent the Plaintiffs in a case regarding Victoria Independent School District. Those lawyers, whom Mr. Korbel could not join, were awarded $100,000 for their time. (Tr. vol. 7, p. 135)
Mr. Korbel has requested $250 an hour for his time (Tr. vol. 8, p. 42), although in 1978 he billed only $100 an hour in a criminal case (Tr. vol. 7, p. 33), and only $125 an hour to the City of San Antonio (Tr. vol. 7, p. 34). Mr. Korbel determined that he should ask for $250 after consulting with other attorneys and looking at surveys of attorneys' fees in the National Law Journal. The Court considers that $200 per hour is a reasonable rate for Mr. Korbel.
Mr. Korbel's hours are correctly stated in his time records, and will be compensated for. The Court notes with some regret that Mr. Korbel's time records are in places scant, but understands that because Mr. Korbel was only working on one case, he found it unnecessary to keep detailed records. (Tr. vol. 9, p. 146) Mr. Korbel reconstructed most of the time records he has presented to the Court by looking at notations of time spent which he made on *573 documents he prepared as he worked on them. Mr. Korbel changed to keeping his time records on computer in 1983, which explains the difference in notations between pre- and post-1983 records. The Fifth Circuit's Rule 47.8 requires that contemporaneous time records be presented in support of claims for attorneys' fees for work performed after January 1, 1983. The Plaintiffs' lawyers kept time records after January 1, 1983 that comport with the rule. No rule required the keeping of contemporaneous records before that date. (Tr. vol. 7, pp. 168-70) The Court finds that Mr. Korbel spent a reasonable amount of time on the cases. The City's major questioning of Mr. Korbel's hours at the hearing was to ask Mr. Korbel why he had attended the charter election which ultimately changed the charter of the City of Houston to provide for election by single-member districts. Mr. Korbel stated that he attended the election in order to be at hand if any problems had to be staved off, and the Court is more than satisfied with Mr. Korbel's explanation. (Tr. vol. 7, p. 177-78)
Mr. Jesse Botello, who has been licensed since 1976 (Tr. vol. 2, p. 146), was also a valuable member of the litigation team. For example, he came to Houston initially to assess the state of the case when Mr. Korbel was asked to join the litigation team. Once the case began in full force for him and Mr. Korbel, Mr. Botello located and helped initially prepare expert witnesses. When the case went up on appeal, Mr. Botello helped write the appellate brief. (Tr. vol. 2, pp. 180-81) In fact, Mr. Korbel brought Mr. Botello into the case because of Mr. Botello's experience with Voting Rights Act cases. (Tr. vol. 7, p. 139) Mr. Botello is such an expert in the field of voting rights that he authored the Handbook on the 1975 Voting Rights Act in 1976. (Tr. vol. 2, p. 164) In sum, Mr. Botello's skills in this area are unparalleled by few lawyers in Texas. (Tr. vol. 2, pp. 162-63).
As with all the other lawyers, Mr. Botello endured personal hardship in order to represent the Plaintiffs in the cases at bar. The cases precluded his pursuing other activities that he normally would have undertaken, including accepting a Reginald Heber Smith Fellowship which he was awarded at the end of law school and taking other employment. (Tr. vol. 2, p. 163) The Court notes that Mr. Botello suffered hardship personally that the other lawyers were not exposed to. For example, Mr. Botello slept on the floor in Al Greene's office while preparing for the cases. (Tr. vol. 2, p. 183) Mr. Botello is requesting $250 per hour for his participation in the cases, which he claims to be the prevailing rate in Houston for the relevant time period. (Tr. vol. 2, p. 193) One Hundred Fifty Dollars ($150) per hour is the proper rate for Mr. Botello's services, given Mr. Botello's length of time in practice. However, the Court recognizes that length of time in practice is not the sole criterion to be considered in determining a correct fee. See Johnson, 488 F.2d at 718-19 ("Longevity per se, however, should not dictate the higher fee. If a young attorney demonstrates the skill and ability, he should not be penalized for only recently being admitted to the bar.")
Mr. Botello's time is adequately stated and should be compensated for. Mr. Botello was trained in law school to keep good time records on the work that he is doing (Tr. vol. 2, pp. 157-58, 187-88), and the Court is satisfied with the completeness and reasonableness of those time records. The City's expert pointed out that Mr. Botello sometimes billed for matters in the cases for which the other lawyers did not bill and on occasion only sketchily described his work. (Tr. vol. 9, pp. 64-65) However, the Court is convinced that Mr. Botello's records are sufficiently complete, given the circumstances under which he was working, to warrant an award of fees in the amount awarded below. Mr. Botello's explanation of his billing judgment also well satisfies the Court. For example, Mr. Botello did not take off large percentages of his time for duplication because the work was so voluminous that the lawyers had to avoid duplication at all cost, and Mr. *574 Botello had to work very efficiently. (Tr. vol. 2, pp. 156-57) In addition, the Court takes into account that Mr. Botello discounted, as is his norm in practice, photocopying and conversations that he held with other lawyers and witnesses. (Tr. vol. 2, p. 157) Furthermore, he did not bill for his law clerk's research relevant to the cases nor the use of his photocopier. (Tr. vol. 2, p. 159)
Mr. Craig Washington, a former state representative and now a state senator, also played an active role in the litigation. Mr. Washington has been licensed since 1969. (Tr. vol. 3, p. 4) At the outset, Mr. Washington held discussions in the black community with leaders regarding the problems with at-large elections that blacks experienced. In addition, Mr. Washington had his hand in helping to select the Plaintiffs for the cases. That selection process was critical since the Plaintiffs' attorneys wished to select as Plaintiffs persons who were not vulnerable politically or vocationally to pressures resulting from the case. (Tr. vol. 3, p. 7) During the pretrial period, Mr. Washington's main task was to help select and interview expert witnesses. For example, he worked with experts who were examining the lack of City services provided to minority communities, and worked with Dr. Chandler Davidson and other demographics experts in preparation for trial. (Tr. vol. 3, pp. 15-16) Mr. Washington also aided Mr. Greene in deciding trial strategy for the cases. Mr. Washington also discussed the merits of single-member districts with City officials, Plaintiffs and black leaders. (Tr. vol. 3, pp. 6-7) At trial, Mr. Washington's primary role was to cross-examine Judson Robinson, who was at the time the sole black member of the Houston City Council. (Tr. vol. 3, p. 13) This assignment was most important, for one of the major arguments of the City was that Mr. Robinson's election city-wide was proof of the absence of racial-polarization. The Court has found, however, that in fact his election was an aberration.
Mr. Washington was well qualified to participate in the case at bar. One of the Plaintiff's witnesses, Jose Garza, regional director of MALDEF, stated that Mr. Washington is considered to be very knowledgeable regarding matters involving voting (Tr. vol. 1, p. 71), and it was generally agreed that Mr. Washington was uniquely qualified to cross-examine Judson Robinson. Mr. Washington's unique qualifications for this task were twofold: first, he was good at cross-examination generally, and second, he was both a black and a long-time resident of the area. For this reason, he could deal with Mr. Robinson's assertions regarding the standard of living in the minority community and the responsiveness of the local authorities to that community. (Tr. vol. 3, pp. 58-59, 84) Finally, Mr. Washington was valuable to the Plaintiff's litigation team because he was the only politician on that team, and, thus, served as a contact the black political community and as a periscope with which to survey the local scene. (Tr. vol. 3, pp. 59, 83-84)
Mr. Washington stated that the case did some damage to him economically, as it precluded other employment during the relevant periods. (Tr. vol. 3, p. 26) Mr. Washington has requested a fee of $250 an hour. (Tr. vol. 3, pp. 26-27) Mr. Washington stated that the only benefit of the suit to him was as a member of the community; he did not receive any fee for his work of the case. (Tr. vol. 3, p. 26) An appropriate rate for Mr. Washington's services is $200 per hour.
Mr. Washington also correctly seeks compensation for work on the attorneys' fees phase of the cases at bar performed by his associates on the recusal question, the Washington, D.C. law firm of Hogan & Hartson. The Court has determined that the requested fees are appropriate for these lawyers, e.g., $200 per hour for the Hogan & Hartson lawyers; $85 per hour for 3.9 of Mr. Bracquet's hours and $100 for the remainder; $60 per hour for Ms. Temple and Mr. Bodie; and $135 per hour for Mr. Evans. The Court has also determined that Mr. Washington's requested fees for associates of his firm are appropriate. The Court considers the time records *575 Mr. Washington kept to be adequate, and heard no serious, specific objection to the reasonableness of the number of hours for which he as requested compensation.
Finally, Frumencio Reyes participated in the case. Mr. Reyes' qualifications for this case are outstanding. He is considered to be an excellent trial attorney, and was particularly suited to the case at bar because he is a hispanic lawyer who was a long-time resident of and well-connected in the community. For example, Mr. Reyes, who has been licensed since 1973 (Tr. vol. 2, p. 103) came into the suit because of his involvement with the Political Association of Spanish-Speaking Organizations ("PASO"). (Tr. vol. 2, pp. 112-13) Like other lawyers, Mr. Reyes suffered from taking the cases at bar. Mr. Reyes has had a professional relationship with some of the Plaintiffs in small matters since 73-1650, but at times had to drop his practice in order to meet the demands of 73-1650. He was only able to maintain a small private practice at the outset of the case and, later, had to split his days between the trial and his practice in family court. (Tr. vol. 2, pp. 122, 126) Mr. Reyes has requested $100 per hour for his services, and the Court is persuaded that that fee is reasonable, if not too low. The fee of his associate, Mr. Aldape, is correctly assessed at $100 per hour. In order to assess the time that Mr. Reyes spent on the cases, he went through the files that he had kept on the cases, saw what he did, and estimated those times that he had not marked down regarding his work. (Tr. vol. 2, pp. 129-30) The Court agrees with Mr. Cooper that Mr. Reyes' affidavit does not itemize tasks performed, which is not the preferred practice (Tr. vol. 9, p. 64); however, the Court does not consider this defect to be fatal to Mr. Reyes' fee request. The Court also considers that the requests for reimbursement of expenses are adequately documented and reasonable.
Finally, the Court must examine the question of whether the requested fees for the experts have some basis in fact. Defendants challenge the propriety of paying expert witness fees. This challenge is spurious, as established case law clearly provides that fees for expert witnesses are available, making no mention of a supposed requisite that Plaintiffs pay the witnesses and then seek reimbursement for that expense. See Berry v. McLemore, 670 F.2d 30, 34 (5th Cir.1982). Mr. Cooper objected to the attorneys' fees request for the experts, stating that an adequate breakdown of the experts' time was not available. (Tr. vol. 9, p. 67) However, the Court finds this defect not to be fatal. The breakdown provided satisfies the Court that the fees requested for the expert witnesses are adequately outlined. Once again, the City's expenditures provide some clue to the size of the task facing the expert witnesses. For example, Dr. Barton Smith, who helped the City of Houston compile some of its statistics, was alone paid at least $11,000 for his efforts. (Tr. vol. 10, pp. 34-35)[32] The absolute necessity for expert testimony has been discussed. The Court would merely note that the experts worked long and hard on the cases. For example, Dr. Davidson spent 210 hours preparing one exhibit alone, Plaintiffs' Exh. 2A (Tr. vol. 4, pp. 54-55), which illustrates the size of the effort which the Plaintiffs' experts undertook. Dr. Davidson has not been paid (Tr. vol. 4, pp. 88-89), and has requested an award of $12,000 as a reasonable fee. The Court considers that fee to be more than reasonable. Similarly, Dr. Richard Murray, an expert in voting rights who did not testify at the trial, has never been paid. Dr. Murray also has requested $12,000, a request the Court will grant.
As the Court noted in its initial discussion of the law, in some cases an upward adjustment of an attorney's fee is appropriate. The Court considers that, in this case, an overall adjustment for contingency is appropriate. In addition, a fee enhancement *576 for Mr. Greene to compensate for the undesirability of the case is fitting.
At the outset, it is necessary to discuss why the factors of contingency and undesirability have been selected as bases for a multiplier. As noted above, many of the Johnson factors are subsumed in the calculation of the "lodestar,"[33] and all therefore not properly employed as basis for awarding a multiplier. In the case at bar, only contingency generally justifies an upward adjustment of the fees. Time and labor (factor 1) required, as well as novelty and difficulty of the questions (factor 2) involved, clearly are reflected in the number of hours spent and compensated for. Skill (factor 3), below a threshold not crossed here, preclusion of other employment (factor 4), and customary fees (factor 5) clearly factor into what hourly rate is deemed appropriate for each lawyer. Time limitations (factor 7), the lawyers' experience (factor 9) and the length of relationship with the client (factor 11) in similar cases all factor into the rate. The press of time oftentimes serves to increase a rate, while rates may be lowered for a long-standing client. Awards in similar cases (factor 12) likewise are accounted for in computing the hourly rate. Finally, results achieved (factor 8) appear in this case to be adequately compensated for in the lodestar. The Court is aware of the magnitude and import of the changes Plaintiffs helped to effect. But the Court is also aware that other factors besides Plaintiffs' efforts played into the adoption of single-member districts. While the case law discussed above makes it clear that entitlement to fees is not precluded by not being the sole catalyst, the Court considers that the existence of other factors that helped bring about change exerts downward pressure on the award of a multiplier.
Contingency (factor 6), though, does justify the award of a multiplier in the instant case. Not all cases that are contingent warrant upward adjustment of the lodestar. Marion v. Barrier, 694 F.2d 229, 231-32 (11th Cir.1982). However, this case was contingent in a number of ways: the law was in many instances unsettled; the case preparation demanded many hours which would be compensated for only if Plaintiffs won and which could have been devoted to work that surely would have yielded a fee; and, even if Plaintiffs were successful, payment is delayed and the actual amount of the fee is subject to scrutiny by a court. The risks entailed in a case that is contingent are ones not compensated for in a flat fee, such as Mr. Cooper described, because Mr. Cooper's firm is paid by its clients whether the clients win or lose. In order to attract lawyers of quality to take risks such as those entailed in the instant cases and work to vindicate issues, a court must compensate with a contingency multiplier. See, e.g., Craik v. Minnesota State University Board, 738 F.2d 348, 350-51 (8th Cir.1984) (per curiam); Williamsburg Fair Housing Committee v. Ross-Rodney Housing Corp., 599 F.Supp. 509, 519-20 (S.D.N.Y.1984). As in the context of an award of attorney's fees in a Title VII case,
Vindication of the policy of the law depends to a significant degree on the willingness of highly skilled attorneys ... to accept employment ... on a wholly contingent basis. They will hardly be willing to do so if their potential compensation is limited to the hourly rate to which they would be entitled in noncontingent employment. Busy and successful attorneys simply could not afford to accept contingent employment if those were the rules that were applied. The enforcement of our civil rights acts would then be entrusted largely to less capable and *577 less successful lawyers who lack sufficient employment. Such an arrangement would ill serve policies of enormous national importance.
Yates v. Mobile County Personnel Board, 719 F.2d 1530, 1534 (11th Cir.1983). Therefore, the Court considers that an overall contingency multiplier of 15% is appropriate.
In regard to Mr. Greene, the additional factor of the undesirability of the case (factor 10) must be taken into account. As indicated above, the racial overtones of the cases at bar very definitely and very negatively affected his legal practice. The cases precluded other employment for all the lawyers by occupying their time, but Mr. Greene's practice was handicapped by his association with a cause linked to minorities.[34] The Court cannot project what Mr. Greene would have earned from employment lost to him because of the cases. The type and amount of work lost is indeterminate. Yet, not to compensate for the detriment of lost work and insult would be grossly unfair. Accordingly, the Court will award an additional multiplier of 5% to Mr. Greene's fees. Multipliers have been given to compensate for a case's undesirability. See e.g., Hart v. Bourque, 608 F.Supp. 1091, 1094 (D.Mass.1985). c.f. Ramos v. Lamm, 713 F.2d 546, 557-58 (10th Cir. 1983) ("a bonus for the social stigma assumed by a lawyer participating in civil rights litigation should rarely be given.") The loss could have been small, e.g., if the potential clients Mr. Greene lost had small matters or matters that would have been impossible to undertake anyway because of the demands of the instant cases. On the other hand, the matters could have been large ones with quick renumeration to be had in settlements with percentages allotted to attorney's fees.

Conclusion
For the foregoing reasons, the Motions for Attorneys' Fees by Al Greene, George Korbel, Jesse Botello, Craig Washington, and Frumencio Reyes are GRANTED.

 TABLE A
 FEES
 TOTAL (includ.
 LAWYER NO. OF HOURS RATE PER HOUR 15% Multiplier)
George Korbel 1391 $200 $319,930.00
Al Greene 1485.1 $200 $356,424.00
 (5% additional
 multiplier)
Jesse Botello 1230 $150 $212,175.00
Frumencio Reyes 141 $100 $ 16,215.00
 Aldape 15 $100 $ 1,725.00
Craig Washington 217.9 $200 $ 50,117.00
 Bracquet 39.1 $ 85 for 3.9 hours and
 $100 for 35.2 $ 4,048.00
 Bodie 47.7 $ 60 $ 3,291.30
 Temple 6.1 $ 60 $ 915.00
 Evans .8 $135 $ 124.20
 Hogan & Hartson 86.25 $200 $ 19,837.50
 ___________
 $984,801.50

*578
 TABLE B
 EXPENSES
 LAWYER AMOUNT
George Korbel $ 2,829.18
Al Greene $ 32,268.64[1]
Jesse Botello $ 5,222.64
Craig Washington $ 110.46
 _____________
 TOTAL EXPENSES $ 40,430.92
 =============
 TOTAL FEES AND EXPENSES TO
 PLAINTIFFS' LAWYERS $1,025,232.40

NOTES
[1] The cases are discussed in more detail below.
[2] The standards for awarding attorneys' fees under the Voting Rights Act are the same that govern awards under  1988. Coalition to Preserve Houston v. Interim Board of Trustees of the Westheimer Independent School District, 494 F.Supp. 738, 742 (S.D.Tex.1980), dismissed, 450 U.S. 901, 101 S.Ct. 1335, 67 L.Ed.2d 325 (1981); see also Hensley v. Eckerhart, 461 U.S. 424, 433 n. 7 103 S.Ct. 1933, 1939, n. 7, 76 L.Ed.2d 40 (1983) (discussing indications in legislative history that standards for fee awards should be the same under  1988 and the 1964 Civil Rights Act).
[3] The court notes that the hours spent on the fee petitions amount to approximately one-third of the fees requested for a series of cases that began in 1973.

The court also notes that C.A. No. H-78-2174 has been amended to include claims that the city violated the Voting Rights Act, 42 U.S.C.  1973 et seq. and the Constitution in 1985. Hours expended in the claim will not be considered in any way in the instant Order. A decision on fee petitions for the work performed in regard to this claim amended in 1985 is reserved for another day, should the Plaintiffs prevail.
[4] The Johnson factors are the twelve considerations the Fifth Circuit stated a court should take into account when deciding awards of attorneys' fees. Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 716-19 (5th Cir.1974).
[5] The principal Defendant in each of the cases is the City of Houston. The Court will hereinafter, for the sake of convenience, refer to the Defendants as "the City" or "Houston."
[6] See, e.g., Wooten v. Housing Authority of the City of Dallas, 723 F.2d 390 (5th Cir.1984) (plaintiff was prevailing party for purposes of  1988 when her lawsuit caused Housing Authority to change policy originally spurring lawsuit, mooting case). The Court in Wooten noted,

In Williams v. Leatherbury, 672 F.2d 549, 550 (5th Cir.1982), we noted that "[v]ictory by judgment or an opponent's concession is not essential to identification of the `prevailing party' entitled to recovery of an attorney's fee under [ 1988]." A party could prevail in an out-of-court settlement, or a defendant might moot the suit by taking unilateral capitulatory action. A plaintiff who attains the sought-after relief by such means "may still recover attorney's fees if he can show both a causal connection between the filing of the suit and the defendant's action and that the defendant's conduct was required by law...." Id. at 551. We defined "causal connection:" to mean that "[t]he suit must be `a substantial factor or a significant catalyst in motivating the defendants to end their unconstitutional behavior.'"
Id. at 391., quoting Robinson v. Kimbrough, 652 F.2d 458, 466 (5th Cir.1981). Directly applicable here is the holding in Davis v. City of Ennis, 520 F.Supp. 262 (N.D.Tex.1981) (three judge court), that a plaintiff who can show a causal connection between his suit and the events that moot his claim will be deemed to have prevailed even though he never obtained a court order in his favor that directly relates to the merits. Id. at 265, cited with approval in Smith v. Thomas, 687 F.2d 113, 116 (5th Cir.1982).
[7] The Second Circuit's opinion made much of the legislative history of  1973l(e), which refers to "action" and "proceeding" as meaning litigation. But, at the same time, the opinion adds immediately thereafter that "[t]here is thus little or no textual warrant for a construction of the fee awards provision which applies it to lobbying in preclearance reviews not in aid of catalytic litigation." Gerena-Valentin v. Koch, 739 F.2d 755, 760 (2d Cir.1984) (emphasis added).
[8] Defendant's argument that administrative procedures are neither actions nor proceedings for purposes of  1988 therefore misses the point: that work done in administrative contexts can be compensable as part and parcel of a successful action or proceeding, a lawsuit.
[9] See, e.g., Leubsdorf, The Contingency Factor in Attorney Fee Awards, 90 YALE L.J. 473, 503 (1981) (Johnson fails to promote uniformity in fee awards; Comment, Adjusting Attorney Fee Awards Through Multipliers in Antitrust Class Actions, 21 HOU.L.REV. 801, 838 (1984) ("Johnson gives little effective guidance, because as a whole, the Johnson factors are vague and duplicative.") [hereinafter cited as "Comment"].
[10] Blum, 104 S.Ct. at 1541, 1548-49.
[11] Id. at 1549.
[12] The Court often asks for additional briefing. However, such a request would be inappropriate since the City has taken the position that as a matter of law the Johnson factors do not apply in light of Blum.
[13] Blum, 104 S.Ct. at 1549-50; Hensley, 103 S.Ct. at 1940.
[14] "We have no occasion in this case to consider whether the risk of not being the prevailing party in a  1983 case, and therefore not being entitled to an award of attorney's fees from one's adversary, may ever justify an upward fee adjustment." Blum, 104 S.Ct. at 1550 n. 17.
[15] Van Ooteghem v. Gray, 774 F.2d 1332, 1339 (5th Cir.1985).
[16] Hereinafter, the Greater Houston Civil Council of Organizations will be referred to as "GHCCO."
[17] According the order remanding the case, the parties agreed that the constitutional issue decided by the district court and presented on appeal was moot.
[18] The City argues that the Court in 75-1731 specifically denied the attorneys' fees requested, and that therefore fees for work performed in that case are not now available. The Court considers Defendants' argument to be incorrect. As will be discussed later in more detail, the three cases together eventually forced the City to adopt single-member districts. And the work in 75-1731, taken as a contribution to the ultimate success of Plaintiffs, should be compensated for. In analagous situations, work for unsuccessful issues that aid in central victory is compensable, See discussion infra; See also Marion v. Barrier, 694 F.2d 229, 232 (11th Cir. 1982) (per curiam) ("the court must consider the relationship of the claims that resulted in judgment with the claims that were rejected and the contribution, if any, made to success by the investigation and prosecution of the entire case," quoting Jones v. Diamond, 636 F.2d 1364, 1382 (5th Cir.1981) and cases cited infra).
[19] Nine Council members are elected from single-member districts, while five are elected at-large.
[20] If obviously discriminatory charges have been made, proof of racially-polarized voting may not be necessary. (Tr. vol. 1, p. 109)
[21] Plaintiffs tried to amend their complaint in 75-1731 in order to include those changes, but the Court denied the Motion for Leave to Amend.
[22] The letter stated in pertinent part:

While our consideration of this submission has not revealed the basis for an objection by the Attorney General, we do note that the annexation here involved is, apparently, a prelude to a more substantial annexation in the future. We also understand that the City of Houston may be considering other annexations which would add a significant number of white voters to the electorate. Should those annexations occur, of course, Section 5 preclearance of those also would have to be obtained and in our consideration of annexations of that nature we would be faced with a more serious question of dilution of the minority voting strength. Accordingly, if such annexations materialize we suggest that the City may want to consider minimizing the dilutive effect of those annexations by some means, such as the adoption of a single-member district system of elections. See, e.g. City of Petersburg v. United States, 354 F.Supp. 1021 (D.D.C.1972), affirmed, 410 U.S. 962, 93 S.Ct. 1441, 35 L.Ed.2d 698 (1973).
Defendants' Exh. 1.
[23] Under this plan, nine members of the City Council were elected from single-member districts, and five were elected at-large. The Department withdrew its objection on August 21, 1979.
[24] Defendant argues that the 73-1650 record was outdated by the time Plaintiffs gave the Department the record. If that is true, the Court is at a loss to explain why Defendant also submitted parts of the record to the Department. Also, no evidence suggests that the record was in fact out-of-date.

Defendant also argues that Plaintiffs' data was neither necessary nor valid and cites a concurring opinion in Jones v. City of Lubbock, 730 F.2d 233 (5th Cir.1984). The Court is unpersuaded by this argument for two reasons. First, the fact remains that the Justice Department did use the Plaintiffs' information. Second, the uncontroverted testimony before the Court indicates that the Department does indeed use the information of the ilk Plaintiffs offer in places such as Houston. The concurring opinion Defendants cite does not refer to Houston, and it is not probative in the least of error in or in uselessness of the data at hand.
[25] The Court notes that Dr. Davidson did not bill for any of the time that he spent working on his book. (Tr. vol. 4, pp. 29-30)
[26] Specific skills of each lawyer will be discussed infra, as well as the time each lawyer spent on the cases.
[27] At the hearing on attorneys' fees not all of the petitioning lawyers asked questions. This does not indicate that those lawyers need not have attended. Each lawyer has his own petition with its own merits, and the lawyers therefore have the right to full representation at the hearing. The Court appreciates lawyers not asking questions if the matter has been fully covered and they have nothing to add. This is an example of efficient use of attorney time and an appreciation of the Court's time constraints.
[28] Mr. Cooper testified that he sometimes exercised billing judgment on travel time, but did not indicate when or why he did so. (Tr. vol. 9, p. 83)
[29] The Court is mindful here of the steps described above by which the lawyers avoided duplicating efforts.
[30] The rates for partners in law firms in Houston with experience levels comparable to Mr. Greene's range from $165 to $250, according to evidence presented to the Court. (See Tr. vol. 9, pp. 30-31 ($165); Tr. vol. 2, p. 44 ($250)) The $200 figure is appropriate because it is near the high end of the market, and takes into account the quality of work in the cases and the many hours spent in performing the legal tasks involved in the cases. This fee is also reasonable in light of the fees the City has paid other lawyers to perform similar tasks. (See Plaintiffs' Exhibit 24)
[31] For example, Mr. Greene's records do not always clearly explain what he was working on, and he billed for solid ten-hour days uniformly during trial rather than his actual time spent. (Tr. vol. 9, p. 65)
[32] In contrast, Dr. Davidson and Dr. Murray have not been paid anything. (Tr. vol. 4, pp. 88-89)
[33] See, e.g., Blum v. Stenson, 104 S.Ct. at 1548-49 (novelty and complexity of issues normally subsumed in "lodestar"); id. at 1549 (quality of representation and results obtained normally subsumed in "lodestar"); see also Gillespie v. Brewer, 602 F.Supp. 218, 228-30 (N.D.W.Va. 1985) ("lodestar" adequately compensates for all factors present in the case but contingency and undesirability of case); Vaughns v. Board of Education of Prince George's County, 598 F.Supp. 1262, 1283 (D.Md.1984) (factors 1-3, 5, 7, and 9 subsumed by "lodestar" and fail to justify multiplier), aff'd in relevant part, 770 F.2d 1244, 1246 (4th Cir.1985).
[34] The Court considers that this is the sort of undesirability for which Johnson compensates. C.f. Guajardo v. Estelle, 432 F.Supp. 1373, 1388 (S.D.Tex.1977), modified on other grounds, 580 F.2d 748 (5th Cir.1978) (case labeled "undesirable" because lawyers devoted themselves to the case without expectation of payment).
[1] Includes $12,000 in fees to expert witness Dr. Chandler Davidson and $12,000 for Dr. Richard Murray.